**AMERICAN AIRLINES, INC., et al., the Port of New York Authority, and Charles H. Ruby et al., Plaintiffs,**

**and the Administrator of the Federal Aviation Agency, Intervenor,**

v.

**TOWN OF HEMPSTEAD et al., Defendants.**

**No. 63 Civ. 1280.**

United States District Court
E. D. New York.

June 30, 1967.

Cleary, Gottlieb, Steen & Hamilton, New York City, for plaintiffs American Airlines, Inc., et al., Fowler Hamilton, Lyman M. Tondel, Jr., George Weisz, Robert A. Fineman, New York City, of counsel.

Sidney Goldstein, New York City, for plaintiff Port of New York Authority, Daniel B. Goldberg, Joseph Lesser, Isobel E. Muirhead, New York City, of counsel.

Cohen & Weiss, New York City, for plaintiffs Charles H. Ruby et al., Samuel J. Cohen, Bruce H. Simon, New York City, of counsel.

John F. Wolf, Civil Division, Department of Justice (Joseph P. Hoey, U. S. Atty., Carl Golden, Asst. U. S. Atty., Nathaniel H. Goodrich, General Counsel, Federal Aviation Agency, Martin J. White, Regional Counsel, Federal Aviation Agency, and Frank Granito, Federal Aviation Agency, of counsel), for Administrator of Federal Aviation Agency, intervenor.

Richard P. Charles and John Hewitt Owen, Brooklyn, for defendants.

DOOLING, District Judge.

Nine major American-flag air carriers, the Port of New York Authority, Charles H. Ruby as president of the Air Line Pilots Association, three air line pilots, individually and as representatives of their class, and the Administrator of the Federal Aviation Agency (as intervenor) have sued to enjoin the enforcement against them of the Town of Hempstead 'Unnecessary Noise Ordinance (No. 25), Article II, as amended March 10, 1964, so far as it applies to aircraft using John F. Kennedy International Airport. Plaintiffs have moved for a preliminary injunction against the enforcement of the ordinance and defendants have moved for a preliminary injunction against violations of the ordinance by the plaintiffs.

Some four thousand pages of testimony have been taken, elaborate affidavits and detailed exhibits have been presented and the parties have, in addition, agreed in effect on many of the background and underlying facts. In addition, tape recordings of actual flyovers monitored by the Town's acoustical expert were played back under controlled conditions which reproduced in the Courtroom as nearly as possible the actual experience of flyovers against a background of normal domestic sounds.

It is concluded that the plaintiffs and intervenor are entitled to enjoin *pendente lite* enforcement of the Ordinance and that the Town is not entitled to a preliminary injunction against violations of the Ordinance by the plaintiffs. The facts have been found separately and will not be repeated in detail here.

The Town of Hempstead lies east of Kennedy Airport and extends both farther north and farther south than the Airport. Some 150,000 residents of Hempstead live within four miles of the Airport. The easterly ends of the five runway strips at Kennedy Airport are from 1,300 to 20,850 feet from the Hempstead boundary.

The conflict in the present case arises out of the Town's addition to its Unnecessary Noise Ordinance of a new article forbidding anyone from operating a mechanism or device (including airplanes) which creates a noise within the Town exceeding either of two "limiting noise spectra." The noise spectra are set out in two tables; the Table I spectrum sets out eight octave bands of center frequencies (in cycles per second) from 63 in the first octave band to 8,000 in the eighth octave band, and sets forth the noise limit for each band in decibels of "band pressure level" (referred to the conventional base of 0.0002 microbars, considered the pressure level of a sound at the threshold of audibility). The decibel limits range from 92 decibels in the first or lowest pitched band to 52 decibels in the eighth or highest pitched band, thus recognizing that high pitched sounds are more "annoying" than low

pitched sounds of equal pressure level. The Ordinance treats as a violation any transient noise having a "duration" exceeding twelve seconds in the daytime hours 7:00 A.M. to 7:00 P.M., or exceeding six seconds in the night hours 7:00 P.M. to 7:00 A.M. The second or Table II spectrum applies to "steady noise" exceeding one minute in duration and the limiting band pressure levels are, in each octave band, 20 decibels lower than the corresponding Table I value. "Duration" of transient noise (during the entire period when the noise from a source is first distinguished from the ambient noise until the noise from that same source finally recedes into the ambient noise) is defined as the time beginning when the noise first exceeds a certain band pressure level until it no longer exceeds the same band pressure level, provided it remains above the same band pressure level for at least one-third of the total "duration." Exceeding the band pressure level in any one octave band is a violation even if all other octave band noises are well below their limiting levels. It is not suggested that the "limiting noise spectra" of the Ordinance are unreasonably low viewed as stating sound levels above which noise is irritatingly loud when heard in private dwellings.

There is no question, indeed both sides insist, that take-offs from and landing approaches to Kennedy Airport regularly produce noise that exceeds the limiting noise spectrum of Table I in Hempstead while the aircraft are passing over parts of the Town. And, in what may be taken to be a typical enough year, in 48% of the landings the aircraft passed over some part of Hempstead and in 36% of the take-offs the aircraft passed over some part of Hempstead. The parties assume that Kennedy Airport will be used more intensively in future, and that in general, the aircraft using the Airport will be larger and will use jet engines of greater thrust than those presently in use.

Plaintiffs and the intervenor contend that the Town is impotent to impose such anti-noise legislation as is here involved because it amounts to forbidden regulation of interstate and foreign commerce. Defendants contend that the Ordinance is a proper exercise of police power to protect the welfare of its citizens and that it does not operate in any field actually occupied by federal action or peculiarly reserved for federal action. Defendants argue strenuously that overflights can be all but eliminated by changing take-off and landing approach procedures in logical extension of existing procedures already approved by the Federal Aviation Agency (FAA) for certain take-offs and landings at Kennedy Airport.

It would be difficult to exaggerate the magnitude of the regional and national commitment to Kennedy Airport, and the importance of its role in the interstate and intercontinental transport of mail, passengers and cargo, and it is needless to add that air transport, and particularly long distance air transport, is not an optional alternative to ground and water transport but is indispensable. The two other major airports serving the greater Metropolitan area, LaGuardia and Newark, operated under a common control through the Port of New York Authority, do not, with Kennedy, provide all the airport capacity the region requires. The search for new airport facilities to relieve the overburdened airports of the present and make room for the future has been publicly conducted for years.

In the years since 1948, when the Port Authority undertook to operate Kennedy, turbo and fan jet aircraft have all but displaced turbo and piston driven propeller craft. Larger, heavier and faster than propeller craft, the jets have demanded lengthened runways, and exacted new constants of air traffic management. Broadly, the airport base they required, was, in absolute terms, larger in every dimension than what had been required for propeller craft, and the inverted truncated cone of air space resting on the airport, that can be thought of as representing the zone marked by the jets' landing glide slopes of about three de-

grees, was far nearer the edges of the airport and closer down on the bordering communities. It was as if every existing propeller craft runway had been suddenly moved out toward the boundary of the airport. The margin of laterally insulating air that had sheltered the neighborhood of the airport from take-off and landing noise was radically reduced and the impact on the surrounding communities was marked and unhappy.

The Town of Hempstead, neighboring the Airport to its east, is the largest town in the State. It is 128 square miles in area and has grown rapidly in population in recent years; its population was 432,506 in 1950, was 740,738 in 1960, and was estimated at nearly 806,000 in September 1963. In 1964 there were about 225,000 dwelling units in the town, and the population density in the areas nearest to the Airport exceeded 10,000 persons per square mile. It is estimated that 150,000 people live in the incorporated villages that lie within three miles of the Airport. The Town is primarily residential.

The problem with which the Town Ordinance deals does not affect the whole Town. Parts of the Town—Levittown and Wantagh, for example—are as far from the center of the Airport as is Central Park. Thickly populated areas in Queens, including the Rockaway Peninsula, and Brooklyn are as close to the center of the Airport as the north-west corner of the Town, which is affected by flights taking off from or landing on the northeast—southwest oriented runways at Kennedy. The noise problem is not peculiar to Hempstead nor does it equally affect the many communities in the Town. It is a problem that affects communities in terms of their proximity to the Airport quite without reference to town, city and borough boundaries.

The dimensions of the noise problem cannot be minimized. It is, however, one of the manifold of environmental problems that press on a society in which the pace of industrialization steadily outstrips the capacity to deal with its modification of the total environment of urban and suburban existence. Perhaps the aircraft noise problem differs in that it appears to be unavoidable, in the present stage of technical development, and not a consequence of the failure to take feasible precautions or to provide practical remedies.

The testimony has dealt mostly with turbo-jet and turbo-fan aircraft since they are the ones on which the problem centers and they are steadily displacing propeller driven aircraft. The testimony—and this area is non-controversial—showed that the noise sources are the compressor whine produced by beating of the blades and vanes on the air and the sound produced outside the engine by the exhaust discharge, moving at high velocity and shearing through the ambient air and dragging it along in eddies that increase in size as they are swept along. The sound wave length—and sound pitch—of the eddies is related to their diameter. Turbo-jet and turbo-fan engines, while broadly similar as noise sources, differ in that the wake velocity of the turbo-fan is relatively lower and more of the energy of the engine is used in the compressor, which has an annular discharge directly to the air. Jet aircraft noise is thus predominantly the product of relative mass flow between the ambient air and exhaust discharge. There is no indication that it could be muffled like an automobile engine or that progress in diminishing noise-production by jet engines can in the foreseeable future do more than mitigate it by such advances as the turbo-fan represents in relation to the turbo-jet.

Given the jet engine, with its noise characteristics, the amount of noise it produces in service as it affects the neighborhood of an Airport is determined by the airframe of the aircraft, its take-off weight or landing weight, the thrust applied by its engines, the flap setting of the wings and other physical constants. The evidence showed plainly take-offs and landings are essentially mathematical solutions of problems in physics and not inspirational piloting. The evidence is very clear that a very

high degree of skill and judgment in the piloting of aircraft is indispensable, but the point is that, to the uninitiate, the flght manual is an immense array of graphs and tables that translate aircraft weight, air temperature and humidity, change in weight during flight due to fuel loss, radius of turn, angle of bank, and many other elements into quantitative measures of air speed, thrust setting, flap setting etc. The testimony made it very clear that flying a jet transport is a complex enterprise.

The aircraft in flight is inevitably a noise source. It travels at the center of a sphere of sound that attenuates with distance in accordance with the law of inverse squares ("spherical divergence") and by an absorption constant determined by atmospheric conditions and the octave band level of the sound; the higher frequency sounds are much more affected by absorption than low frequency sound. In general doubling the distance at which a noise is measured reduces it by six decibels. The noise of the aircraft is inseparable from it, and the evidence is clear that the noise cannot be much or safely mitigated by diminishing thrust at the levels at which take-offs and landings are executed. The evidence explored these matters exhaustively and they are detailed in the findings.

The picture that emerges clearly is that the aircraft are operated in a thoroughly responsible manner and with an attention to engineering detail that would have been difficult to credit without the thorough evidentiary elaboration it received during the trial. Equally clear is the demonstration that noise is regularly created in the Town which radically exceeds the limiting noise spectra of Table I of the Ordinance. The evidence supports no other conclusion than that continued operation in accordance with present operating procedure will create noise in the Town substantially in excess of the ordinance criteria. The records of overflights that were in compliance indicate that the flights were at altitudes so high that the aircraft could not land at or take-off from Kennedy at all if required to maintain those compliance altitudes over Hempstead. The various monitorings of flights produced aggregate samples that were sufficiently large, and free from the suspicion of pre-selection and tendentious exclusions, to establish that the pattern of systematic non-compliance with the ordinance was a direct consequence of the basic plan of airport use and was not due to differences among pilots or among airlines, or, among jet aircraft, to differences in take-off weight or aircraft size, although all of these factors bore on the degree of non-compliance.

The collision between the present mode of operating the Airport and the Hempstead ordinance is, thus, direct and complete. The ordinance is a noise ordinance in objective. Hempstead has, presumably, no desire to regulate the conduct of the Airport for regulation's own sake. Yet the Ordinance can achieve its objective only if overflights are above the calculated altitudes required to achieve compliance. If the Ordinance is to be complied with landing approaches and take-off procedures long in use, and chosen for valid air traffic and safety reasons, will have to be abandoned.

■ The aircraft and its noise are indivisible; the noise of the aircraft extends outward from it with the same inseparability as its wings and tail assembly; to exclude the aircraft noise from the Town is to exclude the aircraft; to set a ground level decibel limit for the aircraft is directly to exclude it from the lower air that it cannot use without exceeding the decibel limit. The Town recognizes this, for it proposes, with ingenious analysis, a new pattern of Airport use the essence of which is that overflights of Hempstead will be radically diminished and almost all those that do occur will be at heights at which compliance seems a possibility. In a word, the Ordinance does not forbid noise except by forbidding flights and it is, therefore, the legal equivalent of the invalid Cedarhurst Ordinance. All

American Airways v. Village of Cedarhurst, E.D.N.Y.1952, 106 F.Supp. 521, aff'd, 2d Cir. 1953, 201 F.2d 273; after final judgment, aff'd, sub. nom. Allegheny Airlines v. Village of Cedarhurst, 2d Cir. 1956, 238 F.2d 812. Like the Cedarhurst ordinance, it denies the lower air to aircraft and closes against them landing approaches and take-off paths to an established airport in contravention of the federally granted public right of freedom of transit through navigable air space (49 U.S.C. § 1304) including the air space needed to insure safety in take-off and landing of aircraft [49 U.S.C. § 1301(24)]. See also City of Newark, N. J. v. Eastern Airlines, D.N.J. 1958, 159 F.Supp. 750.

It would not be enough to save the ordinance that it is grounded in a concern for local order and public health, so that, if the ordinance had been enacted in another context it might have been valid. Cf. Weber v. Anheuser-Busch, Inc., 1955, 348 U.S. 468, 479–481, 75 S.Ct. 480, 99 L.Ed. 546. The decisive question is whether the ordinance, operating as it must if it is to achieve its objectives, conflicts with federal law, or invades a field of legislation reserved to the national government. Given the necessary effect of the ordinance as it applies to interstate and international aircraft flights in the navigable air space surrounding Kennedy Airport, it must be concluded on the present record that the ordinance is invalid. The legislation operates in an area committed to federal care, and noise limiting rules operating as do those of the ordinance must come from a federal source.

 To dispose first of an argument presented in various forms: the case is not involved with landowners' rights, or with concepts of trespass or nuisance. The ordinance is not an exercise of landowners' rights, but it is, if valid, an exertion of police power purely as such; it as much restricts the right of Hempstead landowners to create excessive noise as it does the right of overflying aircraft. So far as landowners are concerned, they are constitutionally entitled to just compensation if overflights are such in nature, proximity and frequency as to amount to a taking of the property for public purposes (United States v. Causby, 1946, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; Griggs v. Allegheny County, 1962, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585); but that does not constrict the federally granted public right of freedom of transit through air space, including that needed for safe landing and take-off, and certainly confers no legislative power on municipalities. Cf. Avery v. United States, 1964, 330 F.2d 640, 642, 165 Ct.Cl. 357, as to compensable interferences with the enjoyment of property. Such a case as Swetland v. Curtiss Airports Corp., 6th Cir. 1932, 55 F.2d 201, dealing with a private landing field and not with a public airport, enjoined the operation of the field as planned on nuisance grounds, but it is not expressive of the present-day law applicable to public airports. Contrast Loma Portal Civic Club v. American Airlines, Inc., 1964, 61 Cal.2d 582, 39 Cal. Rptr. 708, 394 P.2d 548; Martin v. Port of Seattle, 1964, 64 Wash.2d 309, 391 P.2d 540. And, again, the question is not what rights landowners may or may not have but what ordinances the Town may validly enact.

Such an ordinance as Hempstead's cannot be considered in the accident of its particular circumstances. Thus, much that the Town argues about the possibility of operating the Airport without intrusions into the Town's air space is wholly irrelevant. In the perspective of power, the ordinance must be tested as if it were one of a set of ordinances each enacted by a bordering town, and all, taken together, enveloping the airport. Diversion of the airport traffic over another Town would then be impossible and each ordinance would be revealed in its inner nature as a direct regulation of aircraft flight. The test is whether the power of enactment is present; to show that, adventitiously,

the power, as sought to be exercised, may not render airport operations impossible, but may only require their diversion to other parts of the navigable air space, shows only that the consequences of the exercise of the power may be avoidable, because of accidental features of the circumstances in which it is exercised; it does not show that the exercise of the power is valid. The question remains, may the municipalities that surround an airport adopt such ordinances as Hempstead's which deny to aircraft those parts of the navigable air space that cannot be used without causing noise on the ground in excess of specified limiting noise spectra.

■ The regulation of interstate and foreign navigation has from the beginning of our constitutional history raised questions of the relative scope of state power and of the power of the national government. Gibbons v. Ogden, 1824, 22 U.S. (9 Wheat.) 1, 196–197, 209–212, 230–237, 6 L.Ed. 23; Cooley v. Board of Wardens, 1851, 53 U.S. (12 How.) 299, 319–320, 13 L.Ed. 996. The inquiry whether regulation of the navigation of aircraft in interstate and foreign commerce is a field—in the language of *Cooley*—"imperatively demanding a single uniform rule" does not need to be and cannot be broadly answered. But legislation, whatever its purpose, that denies access to navigable air space by local rule cannot but be regarded as a plain and forbidden exertion of the power to regulate commerce as such. Cf. Leisy v. Hardin, 1890, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128. By the very nature of the power exercised, it could be used by neighboring towns to impose different and inconsistent rules, and the operator of aircraft thus be required to conform to the most exacting rule. Cf. Southern Pacific Co. v. State of Arizona, 1945, 325 U.S. 761, 767–769, 65 S.Ct. 1515, 89 L.Ed. 1915.

But even if the commerce clause were not thought without more to preclude local action of the kind here involved, the actual exercise by the Congress of the power to regulate in this field is so pervasive as to preclude valid enactment of the Hempstead Ordinance. It would be difficult to visualize a more comprehensive scheme of combined regulation, subsidization and operational participation than that which the Congress has provided in the field of aviation. Federal aid for public airport development is provided (49 U.S.C. § 1101 et seq.), and both economic, technical and operational regulation is provided (49 U.S.C. § 1301 et seq.) starting from the basis of an unqualified assertion of the public right of freedom of transit through the navigable air space of the United States. Carriers and routes are certificated by the Civil Aeronautic Board, the FAA certificates aircraft and air men. The Administrator of the FAA is authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft for the navigation and protection of aircraft and for the protection of persons and property on the ground, including rules as to safe altitudes of flight and for the prevention of aircraft collision. In exercising his rule-making authority the Administrator is subject to the provisions of the Administrative Procedure Act. He is authorized and directed to assign by rule, regulation or order the use of navigable air space to insure the safety of aircraft and the efficient utilization of air space. The Administrator is authorized—within the limits of appropriations—to acquire and operate air navigation facilities where necessary and to provide necessary facilities and personnel for the regulation and protection of traffic. The Administrator's powers include the power to prescribe by regulation the minimum altitudes of flight defining the lower limit of navigable air space.

The powers granted by the Congress are not dormant but actively exercised. The regulations of the Administrator are of formidable proportions, impressive detail and manifest sophistication. The findings and conclusions set out those

regulations and related matters that most nearly affect the present case.

For present purposes it is enough to note that the FAA prepares and publishes approach procedures and standard instrument departures (SIDs) for Kennedy Airport which are provided to pilots and, taken with the elaborate flight manuals approved by the FAA and carried in each plane, standardize every material element of a commercial airline take-off or landing including flight path, glide slope on landing and, within limits, climb-out procedure. Every such take-off and landing is a moving part in a vast complex of regional aircraft traffic control that involves transfer of aircraft from one FAA manned control center to another until the aircraft is safe-landed on the runway or en route out of the area. The weft of federal airways and electronic navigational aids mapped on the airmen's charts is a record of the elaborateness, complexity and immediacy of the federal provisions of aids to and controls of air traffic. As one of the witnesses put it, when asked about the approach of aircraft from about 200 miles out (Tr. 2530):

> "The aircraft is under continuous Air Traffic Control at all times, so therefore its track over the earth and altitude and descent and changes in altitude and final approach clearances are all controlled parts of flight. They are not free wheeling. * * *"

The federal regulation of air navigation and air traffic is so complete that it leaves no room for such local legislation as the Hempstead Ordinance. Cf. Campbell v. Hussey, 1961, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299; Rice v. Santa Fe Elevator Corp., 1947, 331 U.S. 218, 230–234, 67 S.Ct. 1146, 91 L.Ed 1447; Southern Pacific Co. v. State of Arizona, supra 325 U.S. at 779, 65 S.Ct. 1515; Cloverleaf Butter Co. v. Patterson, 1942, 315 U.S. 148, 154–156, 62 S.Ct. 491, 86 L.Ed. 754; Hines v. Davidowitz, 1941, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581; Pennsylvania R. R. Co. v. Public Service Commission, 1919, 250 U.S. 566, 568–569, 40 S.Ct. 36, 64 L.Ed. 1142. There are, to be sure, areas of freedom within the system of controls, as, for example, in the basic rule that the pilot in command of an aircraft is the final authority on its operation [14 C.F.R. § 91.3(a)], and, again, in the degree of pilot discretion when flying under Visual Flight Rules (VFR) during fair weather as against the tighter and more sternly patterned controls operative when the pilot is under Instrument Flight Rules (IFR); and there is always the pilot's responsibility to use his judgment in emergencies, and in identifying emergencies. But these are discretions delegated to certificated airmen, flying certificated aircraft and drawing their flight data from FAA approved flight manuals, delegated discretions dovetailed into and forming a part of the comprehensive control of air traffic and navigation by FAA regulations, tower bulletins and traffic control personnel. Cf. Local 24 of Intern. Broth. of Teamsters, etc., v. Oliver, 1959, 358 U.S. 283, 296, 79 S.Ct. 297, 3 L.Ed.2d 312. But in a congested area like that surrounding Kennedy Airport, and for jet transports, IFR flying is the rule and VFR procedure the exception because the pilots all but universally opt for the safeguards implicit in voluntary subjection to IFR procedures.

The Town observes that the Port of New York Authority is apparently permitted to regulate flight. It has imposed a noise limitation on take-offs, and it monitors take-offs to assure compliance; it imposes a 10:00 P.M. to 7:00 A.M. runway preferential that requires take-offs over Jamaica Bay. Valid or not, and the airlines do not concede validity, the Port Authority rules are rested on its supposed right as the airlines' landlord to impose conditions on the airlines' use of the Authority's leasehold property. See Port of New York Authority v. Eastern Air Lines, Inc., E.D.N.Y.1966, 259 F. Supp. 745. In obedience to this view of its own action, the Authority imposes

rules on take-offs, for they occur on the Authority's property, and does not impose them on landings, for that would be an exertion of authority over approach procedures executed off the rental premises. The Authority points out, too, that its rules are expressly subordinate to the FAA rules and do not profess to authorize or direct anything not authorized under the FAA rules, regulations and Tower bulletins.

It is argued with force that the federal legislation nowhere in express words confers the power to regulate noise or to protect those living near airports from noise intrusions, and that the "Harris Report" to the Committee on Interstate and Foreign Commerce of the House (H.R.Rep. No. 36, 88th Cong. 1st Sess., 1963) assumed that the localities could exercise police power in the noise abatement field. But the point would seem rather to be whether the Congress authorized the FAA to ignore noise considerations in regulating noise-inseparable air traffic in the perspective of safety to the aircraft and to persons and property on the ground. The FAA is not free to ignore, and it has not ignored, noise abatement considerations in its work on aircraft design review, airport planning, airway establishment and local traffic control, nor in drafting its flight control regulations and bulletins. The public interest in safely attainable quiet is obvious. The preferential runway system established by the FAA for Kennedy Airport is noise-oriented, and so is its regulation requiring large aircraft to enter the Kennedy Airport traffic area at not less than 1,500 feet (14 C.F.R. 93.33); the general rule requiring large departing aircraft to climb to 1500 feet as rapidly as practicable [14 C.F.R. § 91.87(f) (2)] serves that purpose as well as others, as do the tracks established for approach-procedures and for take-off vectors. The assumption of the Harris Report that local police power could function cannot be taken to express the view of the Congress nor to negate either the content of the statutes, or the practice of their administration; no legislative action was taken on the report.

The Town argues from Huron Portland Cement Co. v. City of Detroit, 1960, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed. 2d 852 that such local exercises of police power are valid even if they affect instrumentalities of commerce. The Court there sustained a local smoke abatement ordinance as applied to a federally licensed and enrolled vessel which was subject to much federal regulation, including annual inspection requirements that extended to its boilers. The Court considered that the smoke ordinance did not directly regulate commerce. The Court noted (362 U.S. at 448, 80 S.Ct. at 818) that the law did not "destroy the right of free passage." The Hempstead Ordinance on the contrary does deny the right of free passage. The *Huron* case, it will be seen, did not hesitate to test the smoke ordinance for its effect on commerce; the case makes plain that the ordinance in question to be valid must be not only rooted in a proper and real local police power interest, but it must also be free of direct regulation of commerce, it must not burden commerce, and it must not operate in a field fully occupied by federal legislation.

By the test applied in Head v. New Mexico Board of Examiners, 1963, 374 U.S. 424, 429–430, 83 S.Ct. 1759, 10 L. Ed.2d 983, to a state statute addressed to a public health interest, there is here, on the present record, that direct conflict between federal action and the ordinance which requires invalidation of the ordinance. As the findings explain in detail, the Ordinance forbids flight paths that the FAA has approved for landing approaches and for take-offs. For example, the instrument landing system (ILS) approach approved by the FAA for the left runway on a 220° heading passes over an outer marker 5.6 miles from the landing threshold of the runway at 1,692 feet, and the path descends on 2° 45′ glide slope to 218 feet when 0.6

miles from the threshold. The outer marker is in Hempstead and this ILS approach could not be used by present day jet aircraft without violating the ordinance. The ILS approach to the right runway on a 310° heading, similarly has its outer marker at 5.6 miles, in Hempstead, and descends on a glide slope of 2° 30′ from 1,557 feet at the outer marker to 198 feet at the middle marker 0.6 miles from the landing threshold. What· are called "VOR" approaches to the left runway on 310° heading pass over Hempstead at relatively low altitudes on approach headings of 321°, 297° and 285° and at glide slopes not exceeding 3 degrees. All these landing approaches involve direct conflict with the ordinance. Similarly the take-off procedures involve flight over Hempstead at altitudes that inevitably produce noise in excess of the ordinance limits in the Town from the aircraft of the present day.

The instances cited are the easily visualized direct collisions that meet the strict test of Florida Lime & Avocado Growers, Inc. v. Paul, 1963, 373 U.S. 132, 142, 929, 83 S.Ct. 1210, 10 L.Ed.2d 248. The conflict, however, is also subtler. Local initiative in noise control of aviation is inherently an effort to regulate a consequence while disclaiming regulation of the cause. It cannot coexist with a comprehensive system of federal regulation of aircraft manufacture (through certificates of airworthiness) and federal regulation of air navigation and air traffic. Cf. Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 1948, 333 U.S. 103, 105–106, 68 S.Ct. 431, 92 L.Ed. 568, Northwest Airlines, Inc. v. State of Minnesota, 1944, 322 U.S. 292, 302–303, 64 S.Ct. 950, 88 L.Ed. 1283 (concurring opinion of Mr. Justice Jackson). What Mr. Justice Jackson said, concurring, in the latter case points up the essential conflict, and beautifully expresses what is far truer today (322 U.S. at 303, 64 S.Ct. at 956):

"Congress has recognized the national responsibility for regulating air commerce. Federal control is inten-sive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls. It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders. Its privileges, rights, and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state government."

The Town has presented, with impressive skill and ingenuity, a program for changing flight patterns at Kennedy Airport, allegedly within the philosophy of the present pattern and the capabilities of present-day aircraft, so as substantially to eliminate flights over Hempstead. The record support for the program is far from adequate, and it appears to make assumptions about crosswind and tail-wind tolerances and circling procedures on landing and take-off that do not correspond with existing safe-flying procedures. It would appear too that it overlooks, in estimating the fraction of time that tail and cross winds would interdict use of preferred runways, that summing of the times that the wind is in a quarter corresponding to, or perpendicular to, a runway heading is not enough, because it omits to take account of the fact that winds in other quarters may contribute components that belong in the summation of interdicting conditions.

Moreover, the Town's program includes suggestions for diverting traffic over Far Rockaway and Queens that can not be admitted as a valid part of a professed demonstration that such an ordinance is valid, or, at least, not burdensome to commerce, because it can be complied with; to contribute to such an at best doubtful argument for validity,

the demonstration would have to assume that Far Rockaway and Queens have identical ordinances identically enforced, and then show that compliance with all was possible without halting or burdening the use of navigable air space.

There are other and momentous objections to the Town's suggested method of operating the airport. A full scale study of the traffic pattern of the region would be a prerequisite to accepting the suggestions as presenting a means of compliance. In any such examination other communities would in principle, be entitled to be heard. Cf. Ashbacker Radio Corp. v. F. C. C., 1945, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108; 5 U.S.C. § 1003. The technical data would have to be elaborated beyond the present record, complete as it is, to illuminate the meaning and validity of certain assumptions of aircraft capability used in the Town's suggestions, and other matters.

But, as indicated above, the very making of the Town's suggestion for a new mode of operating the airport to achieve compliance demonstrates the invalidity of the ordinance. It illustrates forcefully that the ordinance so radically regulates the use of the navigable air space that a new plan of landing approaches and take-off procedures must be devised and aircraft must be excluded from all except the upper reaches of the navigable air space over Hempstead in order to comply with the ordinance.

As the findings indicate, the nature of the case is, beyond question, such that irreparable injury is implicit in enforcement of the ordinance.

It is concluded that plaintiffs are entitled to a preliminary injunction against the enforcement of the ordinance and that the Town is not entitled to an injunction against plaintiffs' violating the ordinance.

In the light of Rule 65(a) (2) and the divergent positions of the parties on the question of the availability and admissibility of further evidence, the question of further hearing will have to be taken up at counsel's convenience.