457 F.2d 667
 3 ERC 1983, 2 Envtl. L. Rep. 20,146
 LOCKHEED AIR TERMINAL, INC., a corporation, and Pacific
Southwest Air Lines, a corporation,
Plaintiffs-Appellees, Air Transport
Association of America,
Plaintiff-Appellee,
v.
The CITY OF BURBANK, a municipal corporation, et al.,
Defendants-Appellants.
 No. 71-1242.
 United States Court of Appeals,
Ninth Circuit.
 March 22, 1972.
 
 Richard L. Sieg, Jr., Asst. City Atty. (argued), Samuel Gorlick, City Atty., Burbank, Cal., for defendants-appellants.
 Nicholas C. Yost, Deputy Atty. Gen. (argued), Evelle J. Younger, Atty. Gen., Los Angeles, Cal., for amicus curiae.
 Warren Christopher (argued), O'Melveny & Myers, Robert C. Packard, of Kirtland & Packard, Los Angeles, Cal., for plaintiffs-appellees.
 James R. Dooley, Asst. U. S. Atty., Los Angeles, Cal., for amicus curiae.
 Before BROWNING, DUNIWAY and TRASK, Circuit Judges.
 TRASK, Circuit Judge:
 
 
 1
 Hollywood-Burbank Airport (H-B Airport) is owned and operated by Lockheed Air Terminal, Inc. (Lockheed). It occupies approximately 535 acres, of which 128 acres (including portions of each of its two runways) are owned by the Federal Government. As a satellite airport for Los Angeles International Airport, it is included in the National Airport Plan promulgated by the Administrator of the Federal Aviation Administration (FAA) pursuant to the Federal Airport Act of 1946, 49 U.S.C. Sec. 1101 et seq.[1] As such, it is used by United Air Lines, Western Airline, Air West and Pacific Southwest Airlines (PSA) as an alternative to Los Angeles International Airport when weather conditions at the latter prevent its use. Those airlines, together with Continental Air Lines, also use H-B Airport for regularly scheduled flights.
 
 
 2
 United, Western, Air West and Continental are interstate carriers and hold Certificates of Public Convenience and Necessity issued by the Civil Aeronautics Board (CAB). PSA is an intrastate carrier and holds a Certificate of Public Convenience and Necessity issued by the California Public Utilities Commission.
 
 
 3
 H-B Airport is located in a thickly populated area, and is entirely within the City of Burbank except 2,050 feet of the northernmost portion of its northsouth runway, which lies in the City of Los Angeles. The north-south runway is the longer and preferred for take-offs. The east-west runway is better equipped with navigation guides for landing under minimum weather conditions. Both runways lead over residential districts in both directions.
 
 
 4
 In an effort to deal with the adverse environmental effects of jet aircraft at H-B Airport, specifically the problem of noise, the FAA Chief of the Airport Traffic Control Tower at the airport issued a series of runway preference orders. The last one, BUR 7100.5B, issued September 4, 1969, provided that, traffic and weather permitting, the eastwest runway (landing from the east, taking off to the west) should be used as much as possible for departures of turbine powered aircraft between 11:00 p. m. of one day and 7:00 a. m. of the next.[2] Aircraft departing to the west overfly that portion of the City of Los Angeles known as North Hollywood.
 
 
 5
 *****
 
 
 6
 * * *
 
 
 7
 *****
 
 
 8
 * * *
 
 
 9
 *****
 
 
 10
 * * *
 
 
 11
 On March 31, 1970, the City Council of Burbank, in response to continuing complaints about noise from the airport, passed Ordinance No. 2216, which added Section 20-32.1 to the Burbank Municipal Code.[3] That ordinance, which took effect May 4, 1970, prohibited pure jet aircraft from taking off from H-B Airport between 11:00 p. m. of one day and 7:00 a. m. of the next day, and made it unlawful for the operator of the airport to allow such planes to take off at such times. Exception was made for emergency flights where the City Police Department was contacted and the Watch Commander on duty approved. The express purpose of this ordinance was to abate the serious environmental problem caused by the taking off of pure jet aircraft during sleeping hours.
 
 
 12
 One regularly scheduled flight was affected by the ordinance-an intrastate flight of PSA which originated in Oakland and departed from Burbank for San Diego at 11:30 p. m. each Sunday night. The other flights affected were principally departures of corporate jet aircraft.
 
 
 13
 Lockheed and PSA brought suit in the United States District Court for the Central District of California on May 14, 1970, against the City of Burbank and certain of its officers, seeking declaratory and injunctive relief on the ground that the Burbank ordinance is unconstitutional. Air Transport Association of America, an unincorporated association of scheduled interstate air carriers, was permitted to file a complaint in intervention.
 
 
 14
 The district court assumed jurisdiction over the case under 28 U.S.C. Secs. 1331(a) and 1337, and trial of the action was held in September 1970. On November 30, the district court's findings of fact, conclusions of law and judgment were signed and filed. That judgment declared the Burbank ordinance unconstitutional, illegal and void, and enjoined its enforcement. The court held that the ordinance violated the Supremacy Clause, U.S.Const. art. VI, cl. 2, and the Commerce Clause, U.S.Const. art. I, Sec. 8, cl. 3. Lockheed Air Terminal, Inc. v. Burbank, 318 F.Supp. 914 (C.D.Cal.1970).
 
 
 15
 This appeal was taken from that final judgment pursuant to 28 U.S.C. Sec. 1291, and is properly before us. In deciding this case, we limit ourselves to the issue whether the municipal ordinance is unconstitutional under the Supremacy Clause, as that determination is dispositive of the appeal.
 
 
 16
 The Supremacy Clause states that the Constitution, federal laws "made in Pursuance thereof . . .," and treaties "made under the Authority of the United States, shall be the supreme Law of the Land. . . ." U.S.Const. art. VI, cl. 2. It establishes as a principle of our federalism that state and local laws are not enforceable if they impinge upon an exclusive federal domain. This impermissible impingement is diversely described as "preemption" and "conflict." The application of those terms means that the state or local government has attempted to exercise power which it does not possess because of an express or implied denial of that authority in the Constitution, valid federal laws and regulations promulgated thereunder, or valid treaties. See Northern States Power Co. v. Minnesota, 447 F.2d 1143 (8th Cir. 1971). Compare Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), and Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), with Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971).
 
 The Preemption Issue
 
 17
 In this case appellees (and FAA in its amicus curiae brief) contend that the Federal Aviation Act of 1958, 49 U.S.C. Sec. 1301 et seq., operates to deny Burbank the power to enact the ordinance in question. There is no doubt that the Act creates a comprehensive federal scheme to deal with air commerce, under the administrative auspices of the FAA and CAB. Section 1508 declares that the United States possesses and exercises complete and exclusive national sovereignty in the navigable airspace over the country, and section 1304 grants to the citizens of the United States a public right of freedom of transit in this navigable airspace. The CAB issues Certificates of Public Convenience and Necessity to air carriers, without which they cannot engage in air transportation, 49 U.S.C. Sec. 1371, and the FAA Administrator has power to prescribe air traffic rules and develop plans and policy for the use of the navigable airspace, 49 U.S.C. Sec. 1348. He also issues airman, aircraft, air carrier and airport operating certificates. 49 U.S.C. Secs. 1422-1424, 1432. Under section 1353, the Administrator of the FAA is directed to make "long range plans . . . and formulate policy . . ." for the use of the navigable airspace and the development of air navigation facilities, including airports. If an airport is built or materially altered, the Administrator must be notified, even though no federal funds are involved. 49 U.S.C. Sec. 1350.[4] Section 1431, which was added to the Federal Aviation Act in July 1968, specifically provides for responsibility of the FAA Administrator with respect to ecological and environmental problems:
 
 
 18
 "(a) In order to afford present and future relief and protection to the public from unnecessary aircraft noise and sonic boom, the Administrator of the Federal Aviation Administration . . . shall prescribe and amend such rules and regulations as he may find necessary to provide for the control and abatement of aircraft noise and sonic boom. . . ."
 
 
 19
 Appellants (and the State of California as amicus curiae) argue that they are not precluded by the Federal Aviation Act from enacting the ordinance in question as an exercise of their police power, based on the legislative history of 49 U.S.C. Sec. 1431, and the principle of State and local responsibility enunciated in the Environmental Quality Improvement Act of 1970, 42 U.S.C. Sec. 4371 et seq.
 
 
 20
 Whether a federal statute preempts the otherwise lawful authority of a State or local government to regulate in a specific area is a question of Congressional intent. "[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Therefore, if Congress expressly declares that the authority conferred by it shall be singularly federal, the States may not exercise concomitant or supplementary power over the identical activity. Campbell v. Hussey, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961); Rice v. Santa Fe Elevator Corp., supra. Even when Congress has failed to speak expressly to the issue of federal exclusivity, intention to create sole federal authority can be implied. Key factors in this determination include: (1) the pervasiveness of the federal regulation, Rice v. Santa Fe Elevator Corp., supra; (2) dominance of the federal interest in the field of regulation, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 143-144, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); Rice v. Santa Fe Elevator Corp., supra; and (3) the objectives of the federal regulation and whether nonfederal regulation obstructs the full execution of those aims, Perez v. Campbell, 402 U.S. 637, 649, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); Rice v. Santa Fe Elevator Corp., supra.
 
 
 21
 The pervasiveness of federal regulation in the field of air commerce, the intensity of the national interest in this regulation, and the nature of air commerce itself require the conclusion that State and local regulation in that area has been preempted.
 
 
 22
 The overall design of Congress in enacting the Federal Aviation Act of 1958 was to centralize in a single authority the power to establish rules and regulations for the sole and efficient use of the nation's airspace. Air Line Pilots Ass'n, Int'l v. Quesada, 276 F.2d 892, 894 (2d Cir. 1960). This purpose is reflected in 49 U.S.C. Sec. 1303, which lists those matters to be considered by the Administrator of the FAA in the exercise of his powers and the performance of his duties under the Act:
 
 
 23
 "(a) The regulation of air commerce in such a manner as to best promote its development and safety and fulfill the requirements of national defense;
 
 
 24
 "(b) The promotion, encouragement, and development of civil aeronautics;
 
 
 25
 "(c) The control of the use of the navigable airspace of the United States and the regulation of both civil and military operations in such airspace in the interest of the safety and efficiency of both;
 
 
 26
 "(d) The consolidation of research and development with respect to air navigation facilities, as well as the installation and operation thereof;
 
 
 27
 "(e) The development and operation of a common system of air traffic control and navigation for both military and civil aircraft."
 
 
 28
 Those interests were supplemented in 1968 by the addition of 49 U.S.C. Sec. 1431, which provides:
 
 
 29
 "(a) [T]he Administrator of the Federal Aviation Administration . . . shall prescribe and amend such rules and regulations as he may find necessary to provide for the control and abatement of aircraft noise. . . .
 
 
 30
 "(b) In prescribing and amending standards, rules and regulations under this section, the Administrator shall-
 
 
 
 * * *
 "(3) consider whether any proposed standard, rule or regulation is consistent with the highest degree of safety in air commerce or air transportation in the public interest. . . ."
 Pursuant to this statutory scheme, the Administrator of the FAA must balance considerations of safety, efficiency, technological progress, common defense and environmental protection in the process of formulating rules and regulations with respect to the use of the nation's airspace. There is no single objective to which he must address himself, but a complex of goals which may individually lobby for inconsistent results in a given circumstance. Congress has vested the federal agency with the responsibility and concomitant authority to resolve the proper balance among the multiple purposes. If State and local governments were to be allowed to exercise supplementary power in this area, they might conceivably be overprotective of one of the multiple values and upset the delicate balance struck by the FAA under the aegis of federal law.
 The case of Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), vigorously cited by appellants in support of their position, is distinguishable on the basis of this analysis. There, Detroit was allowed to apply its Smoke Abatement Code to a vessel which had federally inspected and approved boilers. The Court found that the purpose of the federal inspection laws was "clearly limited to affording protection from the perils of maritime navigation." Id. at 445, 80 S.Ct. at 817. On the other hand, the purpose of the city regulation was the control of air pollution for the health and welfare of its inhabitants. Id. at 442, 80 S.Ct. 813. Since these purposes were not conflicting and there was no overlap of scope between them, there was no preemption. The federal regulation was solely concerned with safety and not environmental quality, and there was no argument that boilers which complied with the Detroit code might be less safe and, therefore, compromise the federal objective.[5]
 Appellants argue that the legislative history of 49 U.S.C. Sec. 1431 manifests Congress' intention to allow Burbank to regulate as it has. Our attention is directed to that portion of Senate Report No. 1353, 90th Cong., 2d Sess. 6-7 (1968), U.S.Code Cong. & Admin.News, pp. 2688, 2693, which quotes with approval from a letter of June 22, 1968, from the Secretary of Transportation to the Committee on Interstate and Foreign Commerce:
 "The courts have held that the Federal Government presently preempts the field of noise regulation insofar as it involves controlling the flight of aircraft. Local noise control legislation limiting the permissible level of all overflying aircraft has recently been struck down because it conflicted with Federal regulation of air traffic. American Airlines v. Town of Hempstead, 272 F.Supp. 226 (U.S.D.C., E.D., N.Y., 1966). The court said, at 231, 'The legislation operates in an area committed to Federal care, and noise limiting rules operating as do those of the ordinance must come from a Federal source.' H.R. 3400 would merely expand the Federal Government's role in a field already preempted. It would not change this preemption. State and local governments will remain unable to use their police powers to control aircraft noise by regulating the flight of aircraft.
 "However, the proposed legislation will not affect the rights of a State or local public agency, as the proprietor of an airport, from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners acting as proprietors can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory.
 "Just as an airport owner is responsible for deciding how long the runways will be, so is the owner responsible for obtaining noise easements necessary to permit the landing and takeoff of the aircraft. . . . [T]he Federal Government is in no position to require an airport to accept service by noisier aircraft, and for that purpose to obtain additional noise easements. . . . The proposed legislation is not designed to do this and will not prevent airport proprietors from excluding any aircraft on the basis of noise considerations."
 Appellants urge that, according to this Senate Report, 49 U.S.C. Sec. 1431 was intended to apply only to aircraft "in flight," because Hempstead was an "inflight" case.[6] We do not believe this argument rests upon a sound reading of either the Secretary's letter or the statute.
 Pursuant to 49 U.S.C. Sec. 1431, the Administrator of the FAA, after consultation with the Secretary of Transportation, is to prescribe and amend such rules and regulations as he may find necessary to provide for the abatement of aircraft noise. Surely this does not mean abatement of noise of aircraft flying at or above 35,000 feet. That is not the kind of noise from which the public needs "present and future relief and protection. . . ." The statute gives the Administrator power to deal with noise that is offensive to persons on the ground, including the noise created by low-flying aircraft, takeoffs and landings, and the noise created by aircraft on the ground at airports.[7]
 The Secretary's letter emphasizes the status of the one regulating the use of the airport, not the locus of the aircraft when the offensive sounds are produced. A State or local public agency, as the proprietor of an airport, can deny the use of its airport based on noise consideration;[8] a State or local government cannot use its police power to do so.[9]
 The City of Burbank has no proprietorship interest in H-B Airport. It is making an effort to exert its police power in the field of noise regulation, which the Secretary states, and the Committee agrees, has been preempted by the Federal Government. The Supremacy Clause, U.S.Const. art. VI, cl. 2, invalidates that effort.
 Prior to the argument of this case, the court invited the State of California to submit an amicus curiae brief and to participate in oral argument directed particularly to the effect of the Environmental Quality Improvement Act of 1970, 42 U.S.C. Sec. 4371 et seq., on the issues of this litigation. We have had the advantage of the State's comprehensive brief and its oral comments.
 Section 4371(b) (2) of the Environmental Quality Improvement Act places the "primary responsibility for implementing . . ." the national policy for enhancement of environmental quality on "the State and local governments." This general commitment of environmental problems to local regulation does not, however, overcome the preemptive nature of Congress' particular commitment of air commerce problems to the federal domain. See Northern States Power Co. v. Minnesota, 447 F.2d 1143 (8th Cir. 1971).
 The State also points out that the Federal Aviation Act contains a "saving clause," 49 U.S.C. Sec. 1506,[10] a reservation of common law and statutory remedies, indicating that Congress did not intend to preempt state and local regulatory authority.
 "Of course such a general provision does not resolve specific problems, Arrow Transportation Co. v. Southern R. Co., 372 U.S. 658, 671, n. 22 [83 S.Ct. 984, 991, 10 L.Ed.2d 52], but its inclusion in the statute plainly is inconsistent with congressional displacement of the state statute unless a finding of that meaning is unavoidable." Head v. New Mexico Board of Examiners, 374 U.S. 424, 444, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963) (concurring opinion).
 In this case, we have found the conclusion of federal preemption "unavoidable." Furthermore, the Federal Aviation Act also contains language of exclusivity. 49 U.S.C. Sec. 1508 declares that the United States possesses and exercises "complete and exclusive national sovereignty in the airspace of the United States. . . ." That is the same type of expression which the Supreme Court found in the Federal Tobacco Inspection Act to evidence Congressional intent to establish a wholly federal system which States were powerless even to supplement. Campbell v. Hussey, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961).
 The Conflict Issue
 The most recent pronouncement by the Supreme Court in the Supremacy Clause area came in Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). There, the Court held that Arizona's Motor Vehicle Safety Responsibility Act conflicted with Section 17 of the Federal Bankruptcy Act, 11 U.S.C. Sec. 35, which states that a discharge in bankruptcy discharges all but certain specified judgments. The state statute called for the suspension of the license of a driver who was involved in an automobile accident and who failed to post sufficient security with respect to potential liability. This suspension was to continue until any judgment debt incurred as a result of the accident was paid and proof of financial responsibility was given. The act expressly stated that release from the judgment debt through federal bankruptcy proceedings would not terminate the license suspension. In determining that there was conflict, the Court stated:
 "As early as Gibbons v. Ogden, 9 Wheat. 1 [6 L.Ed. 23] (1824), Chief Justice Marshall stated the governing principle-that 'acts of the State legislatures . . . [which] interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution,' are invalid under the Supremacy Clause. Id. at 211 (emphasis added). Three decades ago Mr. Justice Black, after reviewing the precedents, wrote in a similar vein that, while '[t]his Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, ha[d] made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference[,] . . . [i]n the final analysis', our function is to determine whether a challenged state statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' Hines v. Davidowitz, 312 U.S. 52, 67 [61 S.Ct. 399, 85 L.Ed. 581] (1941)." 402 U.S. at 649, 91 S.Ct. at 1711 (emphasis added).
 The Burbank ordinance in question "'stands as an obstacle to accomplishment and execution of the full purposes and objectives of Congress."' Id. The FAA Chief of the Airport Traffic Control Tower at H-B Airport had already issued and put into effect a runway preference order, BUR 7100.5B,[11] dealing precisely with the problem of noise in the vicinity of the airport, at the time the Burbank curfew ordinance was passed. No question is raised as to the authority of the Chief of the Tower to issue this order, nor is there doubt as to its official character.
 The order stated that "[p]rocedures established for the Hollywood-Burbank airport are designed to reduce community exposure to noise to the lowest practicable minimum . . ." (emphasis added). This assertion represents a considered determination by an authorized representative of the FAA that measures of the magnitude of that taken by the City of Burbank are beneath "the lowest practicable minimum." The municipal curfew ordinance, therefore, interferes with the balance set by the FAA among the interests with which it is empowered to deal, and frustrates the full accomplishment of the goals of Congress.[12]
 Because of this conflict, as well as the general preemption of the area of aircraft noise regulation from the exercise of a State or local government's police power, the Burbank ordinance is unconstitutional, illegal and void.
 BROWNING, Circuit Judge, concurs in the judgment and in the portion of the opinion headed "The Conflict Issue."
 The judgment of the district court is affirmed.
 
 
 [1]
 "Private airports which meet the above criteria may be included in the NAP if they are now and will continue to be open to the public, if the facilities are adequate or may be expanded to meet recommended development needs, and if a more desirable location is not evident. Certain highactivity, privately owned airports are also included if a Federal interest has been expressed through provision of facilities such as an air traffic control tower, even though these airports do not necessarily meet the expansibility criteria. Acquisition of such fields by an eligible public body is encouraged wherever possible." 1968 National Airport Plan at 14
 
 
 [2]
 "1. PURPOSE. This Order prescribes procedures to be followed by Burbank Tower personnel in application of noise abatement procedures
 "4. BACKGROUND. The problem of noise in the vicinity of the Hollywood-Burbank Airport has become increasingly serious. More noise complaints are being received. Threats of legal action to be taken to obtain relief from noise are being heard. We need to do everything practicable and within reason to reduce the noise exposure to residents living near the airport. The workload caused in handling and following-up on noise complaints has increased to the point where it occupies a major portion of the administrative workload of the facility. Procedures established for the Hollywood-Burbank airport are designed to reduce the community exposure to noise to the lowest practicable minimum. The procedures are not mandatory on the part of the pilots, however, traffic controllers must be noise abatement conscious and emphasize noise abatement in order to obtain the highest degree of voluntary cooperation from pilots. The area within a 5-mile radius of the Hollywood-Burbank Airport is considered to be a noise-sensitive area.
 "5. PROCEDURES. The following procedures apply to large (over 12,500 pounds) aircraft and all turbine powered aircraft:
 "a. Normally do not assign runway 7 for departures, or runway 25 for arrivals [east-west runway].
 "b. Traffic and weather permitting, make every effort to use runway 7 for arrivals of turbine powered aircraft.
 "c. Traffic and weather permitting, use runway 25 for departure of turbine powered aircraft as much as possible during period from approximately 2300 to 0700 local time when people are asleep (residential area is less dense and further from end of runway west of 25 than south of 15).
 "e. In the event a pilot requests departure on runway 7 or landing on runway 25, honor the request, traffic permitting, but inform the pilot that the runway is 'noise sensitive.' (Residential area closest east of airport.)
 "f. These procedures are not intended to incur delays to aircraft or hamper the controller in handling airport traffic. If the traffic situation existing at the time requires the use of runways contrary to these procedures, controllers may deviate from the procedure. Controllers are expected to use good judgment in making this determination."
 
 
 [3]
 "(a) Pure Jets Prohibited from Taking off Between 11:00 P.M. and 7:00 A.M
 "It shall be unlawful for any person at the controls of a pure jet aircraft to take off from the Hollywood-Burbank Airport between 11:00 P.M. of one day and 7:00 A.M. the next day.
 "(b) Airport Operator Prohibited from Allowing Take-Offs.
 "It shall be unlawful for the operator of the Hollywood-Burbank Airport to allow a pure jet aircraft to take off from said airport between 11:00 P.M. of one day and 7:00 A.M. the next day.
 "(c) Exception: Emergencies.
 "This section shall not apply to flights of an emergency nature if the City's Police Department is contacted and the approval of the Watch Commander on duty is obtained before take-off."
 
 
 [4]
 "In order to assure conformity to plans and policies for, and allocations of, airspace by the Administrator under section 1348 of this title, no airport or landing area not involving expenditure of Federal funds shall be established, or constructed, or any runway layout substantially altered unless reasonable prior notice thereof is given the Administrator, pursuant to regulations prescribed by him, so that he may advise as to the effects of such construction on the use of airspace by aircraft."
 
 
 [5]
 Colorado Anti-Discrimination Comm'n v. Continental Air Lines, Inc., 372 U.S. 714, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963), is likewise distinguishable on this basis
 
 
 [6]
 American Airlines, Inc. v. Hempstead, 272 F.Supp. 226 (E.D.N.Y.1967), aff'd, 398 F.2d 369 (2d Cir. 1968), cert. denied, 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969); Allegheny Airlines, Inc. v. Cedarhurst, 238 F.2d 812 (2d Cir. 1956); and American Airlines Inc. v. Audubon Park, 297 F.Supp. 207 (W.D.Ky.1968), aff'd per curiam, 407 F.2d 1306 (6th Cir.), cert. denied, 396 U.S. 845, 90 S.Ct. 78, 24 L.Ed.2d 95 (1969), involved ordinances enacted by cities and towns near major airports. The airports were not within the respective municipalities' boundaries. The ordinances limited the level of noise which could lawfully be created or the altitudes which could lawfully be assumed by overflying aircraft. FAA regulations with respect to landings and take-offs at the nearby airports required lower elevations and louder sounds than those permissible under the ordinances. The ordinances were, therefor, invalid because to obey them one would have to directly disobey the federal regulations
 
 
 [7]
 The Federal Airport Act of 1946, 49 U.S.C. Sec. 1101 et seq., further emphasizes the interdependence between aircraft and airport. It directs the development of a national plan for:
 "[A] system of public airports adequate to anticipate and meet the needs of civil aeronautics. . . . In formulating and revising such plan, the Administrator shall take into account the needs of both air commerce and private flying . . . technological developments . . . [and] probable growth and requirements of civil aeronautics . . .." 49 U.S.C. Sec. 1102.
 The 1968 National Airport Plan prepared by the FAA in accordance with that directive notes:
 "Thus, we see in the many forms of air travel-air carrier, general aviation, air cargo-a dominant element of the transportation industry in the U. S. The speed and efficiency of movement of goods and people obtained through air transportation are vital to our Nation's continued economic growth. Its advantages must be maintained. It is particularly important that the airport, as a principal component in the air transportation network, meets the demands placed on it by this growth." Id. at 4.
 
 
 [8]
 As the Secretary's letter indicates, this reservation of power to the proprietors of airports to regulate their use derives from Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). That case held that Allegheny County, as promoter, owner and lessor of the Greater Pittsburgh Airport, was responsible to pay compensation for easements taken by the operation of the airport
 Pursuant to this proprietorship power, the City of Santa Monica has successfully imposed a curfew, similar to that envisioned by the City of Burbank, on the Santa Monica Airport. Stagg v. Municipal Court, 2 Cal.App.3d 318, 82 Cal.Rptr. 578 (1969); see In re Dreifus, FAA Regulatory Docket No. 9071 (7/10/69).
 
 
 [9]
 See Opinion of the Justices, 271 N.E.2d 354 (Mass.1971). But cf. Hanover v. Morristown, 108 N.J.Super. 461, 261 A.2d 692 (1969)
 
 
 [10]
 Sec. 1506. Remedies not exclusive
 "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."
 
 
 [11]
 See note 2 supra
 
 
 [12]
 At the date of the imposition of the curfew PSA operated a jet flight which departed H-B Airport at 11:30 each Sunday night for San Diego. An average of about 80 persons boarded at H-B Airport. The effect of the curfew was to terminate the right of flight of prospective passengers through this portion of the airspace at this time