**LOCKHEED AIR TERMINAL, INC., a corporation, and Pacific Southwest Air Lines, a corporation, Plaintiffs,**

v.

**The CITY OF BURBANK, a municipal corporation, et al., Defendants.**

**Air Transport Association of America, Intervening Plaintiff.**

**No. 70-1075.**

United States District Court,
C. D. California.
Sept. 24, 1970.

Kirtland & Packard by Robert C. Packard, Los Angeles, Cal., for plaintiffs.

O'Melveny & Myers by Warren Christopher, Los Angeles, Cal., for intervening plaintiff.

Samuel Gorlick, City Atty., and Richard L. Sieg, Jr., Asst. City Atty., Burbank, Cal., for all defendants except Samuel Gorlick.

Richard L. Sieg, Jr., Asst. City Atty., Burbank, Cal., for defendant Samuel Gorlick.

Nicholas C. Yost, Deputy Atty. Gen., State of California, and John S. Lane, Asst. U. S. Atty., for the Federal Aviation Administration, amicus curiae.

MEMORANDUM FOR USE IN PREPARATION OF PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT.

CRARY, District Judge.

The within action is for declaratory relief and injunction whereby the plaintiffs seek to invalidate an Ordinance of the City of Burbank which prohibits the take-off by jet aircraft from Hollywood-Burbank Airport (HBA) between the hours of 11:00 P.M. (2300) and 7:00 (0700), the next day.

The plaintiff Lockheed Air Terminal, Inc., is the owner and operator of HBA. Plaintiff Pacific Southwest Air Lines (PSA) is an intrastate carrier.

The intervening plaintiff, Air Transport Association of America (ATA), is an unincorporated trade association consisting of some 32 carriers commonly known as scheduled airlines. The members of the Association fly approximately 2400 planes, the great majority of which are jet aircraft.

The Federal Aviation Administration (FAA) has filed an Amicus Curiae brief in support of the position of the plaintiffs.

The City of Burbank and certain public officials are named defendants. The People of the State of California (California) filed an Amicus Curiae brief in support of the validity of the Burbank Ordinance (BuOr).

The provisions of Section 1331(a) and 1337 of Title 28, U.S.C., vest this Court with jurisdiction and venue.

The issues of law involved are:

(1) Has the Federal Government so preempted the fields of the use of air space and the regulation of air traffic as to invalidate and preclude enforcement of the BuOr?

(2) Is the Ordinance in conflict with Federal statutes or regulations and thereby rendered unenforceable by the Supremacy Clause?

(3) Would the enforcement of the Ordinance result in intolerable and unreasonable burden on interstate commerce?

(4) Does the Ordinance constitute an attempted regulation of the phase of the National commerce which, because of the need of National uniformity, demands that its regulation be prescribed by a single authority?

The admitted facts are set forth in the Pre-Trial Conference Order and are as follows:

1. Plaintiff Lockheed Air Terminal, Inc., (hereinafter "Lockheed"), is a corporation organized and existing under and pursuant to the laws of the State of

Delaware and is doing business in the County of Los Angeles, State of California. Lockheed, at all times material herein, was and is the owner and operator of the Hollywood-Burbank Airport.

2. Plaintiff Pacific Southwest Airlines (hereinafter "PSA") is a corporation organized and existing under and pursuant to the laws of the State of California and is doing business in the County of Los Angeles, State of California.

3. Intervening plaintiff Air Transport Association of America (hereinafter "ATA") is an unincorporated trade association, the members of which include virtually all United States scheduled interstate air carriers. Among its 32 members are the following scheduled air carriers which use Hollywood-Burbank Airport: Air West, Inc.; United Air Lines, Inc.; Western Air Lines, Inc. Among its other members is Continental Air Lines, Inc., which obtained authority pursuant to Civil Aeronautics Board Order No. 70–5–52, issued May 12, 1970, "to engage in air transportation with respect to persons, property, and mail * * * between the terminal point Seattle-Tacoma, Wash., the intermediate points Portland, Oreg., and San Francisco-Oakland-San Jose, Calif. (to be served through the Metropolitan Oakland International Airport and the San Jose Municipal Airport), and the terminal point Los Angeles-Ontario-Long Beach-Hollywood-Burbank-Santa Ana-Orange County, Calif. (to be served through the Ontario International Airport, the Long Beach Municipal Airport, the Hollywood-Burbank Airport, and the Orange County Airport)."

4. The City of Burbank is a municipal corporation in the County of Los Angeles, State of California, having power to sue and be sued in its own name;

Dr. Jarvey Gilbert is the duly elected Mayor of the City of Burbank;

Robert R. McKenzie is the duly elected Vice Mayor of the City of Burbank;

George W. Haven, Robert A. Swanson and D. Verner Gibson are duly elected Councilmen for the City of Burbank;

Joseph N. Baker is the City Manager of the City of Burbank;

Samuel Gorlick is the City Attorney for the City of Burbank;

Rex R. Andrews is the Chief of Police of the City of Burbank.

5. The defendants, Gilbert, McKenzie, Haven, Swanson and Gibson, constitute the City Council for the City of Burbank and have the authority to enact and enforce ordinances for the regulation of specified matters within the City of Burbank. Defendant Gorlick and the attorneys within his office have the responsibility of prosecuting violations of ordinances and other misdemeanors within the City of Burbank. The defendant, Rex R. Andrews, as Chief of Police, is responsible for and oversees the enforcement of municipal ordinances including the ordinance here in question.

6. Hollywood-Burbank Airport was dedicated May 30, 1930 and has been in continuous use since that time by both private and commercial aircraft. The Airport provides services to regularly scheduled commercial aircraft as well as to privately owned corporate and general aviation aircraft. Hollywood-Burbank Airport occupies approximately 535 acres, approximately 128 of which are owned by the United States Government. The Airport lies mainly in the City of Burbank and partially in the City of Los Angeles.

7. The City of Burbank has a population of approximately 95,000.

8. On March 31, 1970 the City Council of the City of Burbank duly and regularly adopted Ordinance No. 2216, which added Section 20–32.1 to the Burbank Municipal Code providing as follows:

"Sec. 20–32.1. Aircraft Take-Offs.

"(a) Pure Jets Prohibited from Taking Off Between 11:00 P.M. and 7:00 A.M.

"It shall be unlawful for any person at the controls of a pure jet aircraft to take off from the Hollywood-Burbank Airport between 11:00 P.M. of one day and 7:00 A.M. the next day.

"(b) Airport Operator Prohibited from Allowing Take-Offs.

"It shall be unlawful for the operator of the Hollywood-Burbank Airport to allow a pure jet aircraft to take off from said airport between 11:00 P.M. of one day and 7:00 A.M. the next day.

"(c) Exception: Emergencies.

"This section shall not apply to flights of an emergency nature if the City's Police Department is contacted and the approval of the Watch Commander on duty is obtained before take-off."

and said ordinance became effective on May 4, 1970. The stated purpose of the ordinance is "to prohibit pure jet take-offs at the Hollywood-Burbank Airport between 11:00 P.M. and 7:00 A.M."

9. The defendant officials of the City of Burbank have publicly announced their intention to enforce the curfew ordinance.

10. As a result of the process of industrialization and urbanization, almost one out of every twenty people in the United States lives in the Los Angeles five-county area.

11. Hollywood-Burbank Airport is the most convenient airport for the entire San Fernando Valley, Hollywood, and the cities of Burbank, Glendale, Pasadena, and Alhambra, an area containing a population of over 2.2 million persons.

12. Hollywood-Burbank Airport has two principal runways for the operation of aircraft. These runways are designated by their compass heading in tens of degrees.

(a) The "north-south" runway is situated on an axis of 330°–150°. This runway is designated Runway 33 when it is used by aircraft taking off to the northwest or landing from the southeast, and, Runway 15 when it is used by aircraft landing from the northwest or taking off to the southeast. Approximately 2,050 feet of the northernmost portion of this runway lie in the City of Los Angeles on land owned by the United States Government.

(b) The "east-west" runway is situated on an axis of 070°–250°. This runway is designated Runway 7 when it is used by aircraft landing from the west or taking off to the east, and, Runway 25 when it is used by aircraft landing from the east or taking off to the west. Approximately 2,250 feet of the westernmost portion of this runway lie on land owned by the United States Government.

(c) Aircraft landing on Runways 7 and 15 and aircraft departing on Runways 25 and 33 do not overfly the City of Burbank.

13. The following types of pure jet commercial aircraft operate from the Hollywood-Burbank Airport: Boeing 727, Boeing 737, Douglas DC-9. The following types of pure jet business aircraft operate from the Airport: Jetstar, Gulfstream II, Sabreliner, Lear Jet, De-Havilland and Falcon.

14. Each scheduled interstate air carrier that uses Hollywood-Burbank Airport holds a Certificate of Public Convenience and Necessity issued by the Civil Aeronautics Board which provides as set forth in said Certificate.

15. PSA holds a Certificate of Public Convenience and Necessity issued by the California Public Utilities Commission which provides as set forth in said Certificate.

16. Each scheduled interstate air carrier that uses Hollywood-Burbank Airport holds an Air Carrier Operating Certificate issued by the Administrator of the FAA, which provides as set forth in said Certificate.

17. PSA holds a Commercial Operating Certificate issued by the Administrator of the FAA, which provides as set forth in said Certificate.

18. The Administrator of the FAA has issued Operations Specifications to each regularly scheduled air carrier that uses Hollywood-Burbank Airport, which Operations Specifications provide as set forth therein.

19. Air West operates Douglas DC-9 aircraft at Hollywood-Burbank Airport.

United has operated and operates the following types of aircraft at Hollywood-Burbank Airport: Boeing 727 and Boeing 737. Western operates and has operated Boeing 737 aircraft at Hollywood-Burbank Airport. PSA operates the following types of aircraft at Hollywood-Burbank Airport: Boeing 727, Boeing 737 and Douglas DC–9.

20. Each pilot of a civil aircraft of United States registry operated in the navigable airspace of the United States is required to have in his personal possession a current pilot certificate issued by the Administrator of the FAA (FAR 61.3(a)). Each pilot of an aircraft operated by a scheduled air carrier at Hollywood-Burbank Airport is required to hold a current air transport pilot certificate issued by the Administrator (FAR 61.161). Each flight engineer of a civil aircraft of United States registry is required to have in his personal possession a current flight engineer's certificate issued by the Administrator (FAR 63.3 (b)).

21. Pursuant to newly enacted federal legislation, Hollywood-Burbank Airport is required to apply for an Airport Operating Certificate issued by the Administrator of the FAA pursuant to Section 51(b) of the Airport and Airway Development Act of 1970, Public Law 91–258, 84 Stat. 219 (May 21, 1970), within two years from the date of enactment.

22. The FAA operates the Airport Traffic Control Tower and Radar Approach and Departure Control at Hollywood-Burbank Airport. In connection with such operation the FAA has expended approximately $2 million on the installation of navigational aids at Hollywood-Burbank Airport, including the Instrument Landing System ("ILS"), runway and identification lights, and radar and radio equipment.

23. Pursuant to the Federal Aviation Act of 1958, 49 U.S.C. § 1301 et seq., the Administrator of the FAA has determined that there exists a need for a system that will provide adequate separa-

tion between and orderly control of the air traffic emanating from points within and without the United States and converging on large metropolitan areas and airports, such as Hollywood-Burbank Airport. Accordingly, the Administrator has established a system for the control of air traffic which provides for such separation, and which operates within controlled airspace identified as "control zones" and "control areas." Control zones encompass all the airspace from the surface to infinity within five miles of the geographical center of an airport. Control areas are of varying elevations and dimensions, and include the area surrounding Hollywood-Burbank Airport. The airspace within a control zone below an altitude within 2,-000 feet above the surface is defined as the airport traffic area (FAR 1.1). Hollywood-Burbank Airport is located under a control area, within an airport traffic area, within a control zone and under many converging Federal airways, all of which have been established by the Administrator of the FAA pursuant to statutory authority. Unless otherwise authorized by FAA Air Traffic Control, a pilot operating within an airport traffic area must maintain two-way radio communication with the control tower (FAR 91.87(b)). He is further required to comply with all clearances and instructions that may be issued by Air Traffic Control (FAR 91.75(b)). Air Traffic Control over the aircraft within the Hollywood-Burbank Airport Control Zone, including approach control and departure control, is exercised by FAA personnel located in the control tower situated at the airport. Except when in direct communication with the control tower, each regularly scheduled air carrier is required by its Operations Specifications to operate its jet aircraft in accordance with FAA Instrument Flight Rules ("IFR"). When not under the control of an FAA airport control tower, aircraft operating under IFR are under the direct control of an FAA Air Route Traffic Control Center and are required to com-

ply with the clearances received from that facility. (FAR 91.115, 91.75(a)).

24. Prior to the commencement of operations involving jet aircraft landings and take-offs on the two runways at Hollywood-Burbank Airport, a determination was made by the FAA that such use of each runway would not be unsafe either to persons or property on the ground or to persons and property in the air.

25. No aircraft may taxi at or take off from Hollywood-Burbank Airport without first receiving an appropriate clearance from Air Traffic Control (FAR 91.87(h)). When a commercial jet aircraft is ready for departure from its terminal gate, it makes radio contact with Air Traffic Control. It is at that time assigned a runway for take-off and is ultimately given clearance to taxi thereto. Prior to taking its position on the runway, the aircraft is given departure clearance, which includes the assignment of departure procedures and assignment of a radio beam intersection to which the aircraft is directed to fly. On receiving its clearance to take off, each jet or other large aircraft is required to conform with all FAA take-off procedures and to climb to an altitude of 1,500 feet above the airport surface as rapidly as practicable. (FAR 91.87(f)) Departure clearances for IFR aircraft incorporate standard instrument departure procedures established for Hollywood-Burbank Airport by the FAA. Pictorial charts showing these standard instrument departure procedures are published by the Department of Commerce, United States Coast and Geodetic Survey. Aircraft taking off from Hollywood-Burbank Airport must conform with the assigned FAA departure clearance including all standard IFR departure procedures incorporated therein (FAR 91.75(a), 91.116). Upon reaching an altitude and position clear of other traffic, control of the aircraft is passed from Hollywood-Burbank Departure Control to the FAA Air Route Control Center located at Palmdale, California.

26. On entering and operating within the Hollywood-Burbank Airport Traffic Area, jets and other large aircraft must be operated at an altitude of at least 1,500 feet except when further descent is required for a safe landing. (FAR 91.87(d) (2)) No aircraft may be landed at Hollywood-Burbank Airport without first receiving an Air Traffic Control clearance (FAR 91.87(h)). In addition to exercising approach control, the FAA maintains and operates an Instrument Landing System ("ILS") which electronically establishes a three-degree glide slope to Runway 7 at Hollywood-Burbank Airport. Each of the aircraft operated by the regularly scheduled air carriers is equipped with electronic devices that monitor the ILS glide slope and depict the glide slope position in relation to that of the aircraft on the cockpit instrument. On receiving FAA clearance to approach for landing, the aircraft is required to be at or above the glide slope at the outer ILS marker and to remain at or above the glide slope until reaching the middle ILS marker. (FAR 91.87(d) (2)) The outer marker is located approximately 6.1 nautical miles from the approach end of Runway 7, while the middle marker is located approximately 1.8 nautical miles from the approach end of the runway. The glide slope altitude at the outer ILS marker is approximately 2,000 feet above the surface and at the middle marker is approximately 575 feet above the surface. As an additional means of approach control, the FAA prescribes standard instrument approach procedures which are published in Part 97 of the Federal Aviation Regulations. Pictorial approach and landing charts showing these standard instrument approach procedures are published by the Department of Commerce, United States Coast and Geodetic Survey. Approaches to Hollywood-Burbank Airport conducted under instrument flight rules are required to be in accordance with the standard instrument approach procedures set forth in Part 97 of the Federal Aviation Regulations (FAR 91.116).

27. In the interest of alleviating noise disturbances to the residents of communities adjoining airports located in metropolitan areas, the Administrator of the FAA has established regulations that (1) require turbine powered fixed wing aircraft, approaching for landing, to maintain within the airport traffic area an altitude of at least 1,500 feet above the surface of the airport "until further descent is required for a safe landing," and (2) require such aircraft, when taking off, to climb to 1,500 feet as rapidly as practicable (FAR 91.87 (d), (f)).

28. From February 1968 until July 12, 1970, PSA operated a Boeing 727 aircraft which departed the Hollywood-Burbank Airport at 11:30 P.M. each Sunday night destined for San Diego. This was the only regularly scheduled flight taking off from Hollywood-Burbank Airport between the hours of 11:00 P.M. and 7:00 A.M. This was an intrastate flight originating in Oakland, California with its final destination San Diego, California.

29. Since March 9, 1970 PSA has operated a Boeing 727 or Boeing 737 aircraft on charter to Lockheed California Company which aircraft departs from the Hollywood-Burbank Airport Monday through Friday at 6:40 A.M. destined for Palmdale. This flight is being permitted to operate by the City as an emergency flight.

30. Several fleets of corporate jet aircraft use Hollywood-Burbank Airport as their home base. Prior to the enactment of the curfew ordinance, there were at least three flights per week of corporate jet aircraft during the now-proscribed curfew period.

31. Lockheed Aircraft Corporation operates and maintains military defense plant facilities at Hollywood-Burbank Airport.

The plaintiffs urge that the BuOr is invalid for the following reasons:

(a) The preemption of the field of efficient management of the use of the navigable air space by the Federal Government by statute and regulations and through its agencies, FAA and Civil Aeronautics Board (CAB),

(b) The direct conflict between the BuOr and Federal statutes, regulations and Certificates of Public Convenience and Necessity issued to airlines by the CAB, and

(c) The ordinance is an intolerable and unreasonable burden on interstate commerce.

The defendant City of Burbank and its officials and the People of California contend that there has been no preemption in the field of navigable air space control, of limitation of aircraft take-offs by the Federal Government, or its agencies, which would invalidate the BuOr. The City urges that the Ordinance is in reality a "land use" regulation and that Lockheed, as the owner and proprietor of HBA has the authority to place valid limitations on take-offs of jet aircraft during the curfew and that the City can, in turn, control Lockheed with respect to its land use.

Reliance as to land use is on a statement of the Senate Committee in 1968 to the effect that it was not the intent of the Committee, in recommending the air noise abatement legislation H.R. 3400, to effect any change in the existing apportionment of powers between the Federal and State and local governments and that the authority of units of local government to control the effects of aircraft noise through the exercise of land use planning and zoning powers was not diminished by the bill. S.Rep. 1353, July 1, 1968, U.S.Code Congressional and Administrative News, 1968, pages 2693–2694.

With respect to the Commerce Clause, the defendants argue that in considering the effect of the Ordinance on interstate commerce the Court is limited to the flights out of HBA during the curfew hours and that only the intrastate carrier PSA is involved since that is the only line authorized by the California Public Utilities Commission which has

jet aircraft scheduled to take off during curfew. There are privately owned jet planes that fly out of HBA between 11:00 P.M. and 7:00 A.M., but which do not have Certificates of Public Convenience and Necessity from California or CAB.

## PREEMPTION

The House Report 2360, 85th Congress, 2nd Session, on the Federal Aviation Act of 1958, states as to its purpose: "The principal purpose of this legislation is to establish a new Federal agency with powers adequate to enable it to provide for the safe and efficient use of the navigable airspace by both civil and military operations." [Page 3741.]

That Act established the Federal Aviation Agency, now Federal Aviation Administration, in replacement of the then Civil Aeronautics Administration. The FAA was vested with "plenary authority to—(a) Allocate airspace and control its use by both civil and military aircraft."

The Senate Report 1811 on the 1958 Act, after observing that the action of the CAB in its control over air space allocation and air traffic rules rested for the most part upon " * * * the shifting sands of legal ambiguity", says: "The present legislation proposes to clear away this ambiguity once and for all by vesting unquestionable authority for all aspects of airspace management in the Administrator of the new Agency." The report thereafter states: "The splintering of airspace management in the past through committee and panel negotiation has already been discussed. It is one of the evils which this bill is designed to eliminate. As indicated above, it is for this reason that the bill proposes to vest in a single Administrator plenary authority for airspace management. If such authority is once again fractionalized and made subject to committee or panel decision, the evil will only be continued." In the same report, the Committee observes: "The number of planes seeking their share of our airspace has almost quadrupled

since 1938. Furthermore, the larger and faster that aircraft have become, the more airspace is required for each if proper separation is to be maintained."

The defendants rely on Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1959), as authority for their position that intent to preempt shall not be implied

" * * * unless the act of Congress, fairly interpreted is in actual conflict with the law of the state." [Page 443, 80 S.Ct. page 816.]

The Supreme Court further observes that in consideration of whether a State law has imposed an undue burden in interstate commerce, we should be mindful of the fact that the Constitution, when conferring upon Congress the regulation of commerce, did not intend

" ' * * * to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution.' [Citing cases.] But a state may not impose a burden which materially affects interstate commerce in an area where uniformity of regulation is necessary." [Citing cases] [Pages 443–444, 80 S. Ct. page 816.]

The Detroit Ordinance which was upheld by the Supreme Court involved smoke abatement, and had been violated by one of the ships of appellant company duly licensed to operate in interstate commerce under a regulation enacted by Congress. Air pollution is a local problem and the purpose of the Ordinance was to protect the health and enhance the cleanliness of the local community.

The Court concluded that the mere possession of a Federal license did not immunize the ship from the operation of the normal incidents of police power, not constituting a direct regulation of commerce. Furthermore, the Ordinance

did not exclude a licensed vessel from the Port of Detroit, " * * * nor does it destroy the right to free passage." [Pages 447–448, 80 S.Ct. page 818.]

Applying the rules in the Huron case to the case at bar, we must determine whether the Federal Government, as evidenced by the acts of Congress and regulations involved, intends to fully occupy the field of control of the navigable air space to insure its efficient use. Whether the Ordinance brings to bear an unreasonable burden on interstate commerce is also involved and will be discussed in more detail later in this Memorandum.

The question of intent to fully occupy the pertinent field was considered by the Supreme Court in Napier v. Atlantic Coast Line Railroad Co., 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926). The Georgia statute there involved required curtains and automatic fire-box doors on locomotives. The Court said that the main question in the three cases which were involved on the appeal was whether the Boiler Inspection Act

" * * * has occupied the field of regulating locomotive equipment used on a highway of interstate commerce, so as to preclude state legislation. Congress obviously has power to do so." [Citing cases.]

The Court said that the Interstate Commerce Commission Boiler Inspection Act applied to locomotives in interstate commerce even if operated wholly within one State and not engaged in hauling interstate freight. The Act did not require any particular type of fire-box door but the Court said that although the Commission had made no other requirement inconsistent with the State legislation that fact was without legal significance.

"It is also urged that, even if the Commission has power to prescribe an automatic firebox door and a cab curtain, it has not done so, and that it has made no other requirement inconsistent with the state legislation. This, also, if true, is without legal significance. The fact that the Commission has not seen fit to exercise its authority to the full extent conferred, has no bearing upon the construction of the act delegating the power. We hold that state legislation is precluded, because the Boiler Inspection Act, as we construe it, was intended to occupy the field. The broad scope of the authority conferred upon the Commission leads to that conclusion. Because the standard set by the Commission must prevail, requirements by the states are precluded, however commendable or however different their purpose. [Citing cases.]"

In answering the question as to whether the Federal Government acted with the intent to preempt a field, the Supreme Court, in Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), set forth, in the disjunctive, three tests to be applied:

"So we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. Napier v. Atlantic Coast Line R. Co., 272 U.S. 605, 611, 47 S.Ct. 207, 71 L.Ed. 432; Allen-Bradley Local v. Wisconsin Employment Relations Board, 315 U.S. 740, 749, 62 S.Ct. 820, 86 L.Ed. 1154. Such a purpose may be evidenced in several ways. (1) The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. Pennsylvania R. Co. v. Public Service Commission, 250 U.S. 566, 569, 40 S.Ct. 36, 64 L.Ed. 1142; Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754, 1223. (2) Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it

may reveal the same purpose. Southern R. Co. v. Railroad Commission of Indiana, 236 U.S. 439, 35 S.Ct. 304, 59 L.Ed. 661; Charleston & W. C. R. Co. v. Varnville Co., 237 U.S. 597, 35 S.Ct. 715, 59 L.Ed. 1137, Ann.Cas. 1916D 1139; New York Central R. Co. v. Winfield, 244 U.S. 147, 37 S.Ct. 546, 61 L.Ed. 1045, L.R.A.1918C, 439, Ann.Cas.1917D, 1139; Napier v. Atlantic Coast Line R. Co., *supra.* *(3)* Or the state policy may produce a result inconsistent with the objective of the federal statute. Hill v. Florida ex rel. Watson, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782. It is often a perplexing question whether Congress has precluded state action or by the choice of selective regulatory measures has left the police power of the States undisturbed except as the state and federal regulations collide. Townsend v. Yeomans, 301 U.S. 441, 57 S.Ct. 842, 81 L.Ed. 1210; Kelly v. Washington ex rel. Fass Co., 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3; South Carolina State Highway Dept. v. Barnwell Bros., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734; Union Brokerage Co. v. Jensen, 322 U.S. 202, 64 S.Ct. 967, 88 L.Ed. 1227, 152 A.L.R. 1072."

[Italicized numbers (1), (2) and (3) added.] Pages 230–231, 67 S.Ct. page 1152.

In applying the rules in the *Rice* case, supra, to the case at bar, we consider the facts and circumstances here involved.

The terms of the 1958 Federal Aviation Act would appear to encompass the efficient use and control of the navigable air space in all aspects of its use by aircraft. Control was effected of the traffic density by regulation 14 F.C.R. 93.-121–31, in limiting the instrument flight rules (IFR) operations in high density airports, Kennedy and LaGuardia (N. Y.), Newark (N. J.), O'Hare (Chicago), and Washington National Airport (Wash., D. C.). In limiting the allocations of flights as to various classes of aircraft, the number of flights varied during different periods of a twenty-four hour day.

By way of comment on the regulations applying to the above named high density airports, it is reported in Federal Register, Vol. 33, No. 234, page 17896, Dec. 12, 1968—part 93, that the allocation of flights was to provide relief from excessive delays, not to correct safety problems. At page 17897, the FAA Administrator says: " * * * the public interest in efficient, convenient, and economical air transportation requires more effective use of airport and airspace capacity. The authority of the FAA to regulate aircraft operations to reduce congestion is clear. The plenary authority conferred by the Federal Aviation Act to regulate the flight of aircraft to assure the safe and efficient utilization of the navigable airspace is well established by practice and judicial decision."

Congress and the Administrator are fully cognizant of the problems created by aircraft noise. The Administrator, on page 17897 of the Federal Register, supra, refers to the fact that current scheduling practices reflect that two-thirds of the international passenger flights at Kennedy airport were scheduled to arrive or depart between 3:00 P.M. and 11:00 P.M., but that under the allocations imposed some re-scheduling of these flights might be required. He said that international departures fall off abruptly after 10:00 P.M. and *clearly it would not be in the public interest, considering resultant noise disturbances, to encourage scheduling of more flights at later hours.* The paragraphs 93.121–131 of the regulation referred to above appear on page 17898 of Volume 33, Federal Register, supra.

In the instant case, the FAA, on September 4, 1969, issued a noise abatement order for HBA making runway No. 25 a preferential runway for departure from 11:00 P.M. to 7:00 A.M. (Bur. 7100.5B, para. 5c, pltfs' Ex. 30). This preference was a noise abatement measure for the benefit of the City of Burbank. See Exhibit A hereto for map in-

EXHIBIT "A"

cluding the City of Burbank and showing the location of HBA. This map is a portion of plaintiffs' Exhibit No. 1 herein, to which the Court has added the numbered runways 33 and 25 together with the direction of aircraft approach and take-off on all four runways involved.

Further efforts of Congress to control and abate aircraft noise are encompassed in the provisions of Section 1431, Title 49, United States Code, passed by Congress in 1968 and providing for the FAA Administrator to prescribe such rules and regulations he may find necessary to control and abate aircraft noises and sonic boom.

 From the broad scope of Federal statutes and regulations governing and controlling the use of air space and of air traffic, it would appear that Congress intended to centralize full and dominant control of the navigable air space in the Federal Government so as to provide for its safe and most efficient use.

Included in the statutes in this field are 49 U.S.C. §§ 1301(24), 1303, 1304, 1341(a), 1348 and 1508.

It is true that Section 1506 of Title 49, U.S.C., states that the provisions of Chapter 20 (Title 49, "Federal Aviation Program") are in addition to the remedies then existing " * * * at common law or by statute." Defendants also point to Senate Report 1353, July 1, 1968, supra, wherein it is stated: "It is not the intent of the committee in recommending this legislation to effect any change in the existing apportionment of powers between the Federal and State Local governments." Page 2693. It is to be noted that the Senate Report, at pages 2693 and 2694, also states: "The courts have held that the Federal Government presently preempts the field of noise regulation insofar as it involves controlling the flight of aircraft. Local noise control legislation limiting the permissible noise level of all overflying aircraft has recently been struck down because it conflicted with Federal reg-

ulation of air traffic. American Airlines, Inc. v. Town of Hempstead, 272 F.Supp. 226 (U.S.D.C., E.D., N.Y., 1967). The court said, at 231, "The legislation operates in an area committed to Federal care, and noise limiting rules operating as do those of the ordinance must come from a Federal source.' H.R. 3400 would merely expand the Federal Government's role in a field already preempted. It would not change this preemption. State and local governments will remain unable to use their police powers to control aircraft noise by regulating the flight of aircraft."

In evaluating Section 1506, supra, and the statements of the Senate Committee, we must have in mind the rules governing preemption as announced by the Supreme Court and the provisions of the Commerce Clause of the United States Constitution.

In Chicago & Southern Air Lines v. Waterman Steamship Corp., 333 U.S. 103, at page 107, 68 S.Ct. 431, at page 434, 92 L.Ed. 568 (1948), the Supreme Court states:

"Of course, air transportation, water transportation, rail transportation, and motor transportation all have a kinship in that all are forms of transportation and their common features of public carriage for hire may be amenable to kindred regulations. But these resemblances must not blind us to the fact that legally, as well as literally, air commerce, whether at home or abroad, soared into a different realm than any that had gone before. Ancient doctrines of private ownership of the air as appurtenant to land titles had to be revised to make aviation practically serviceable to our society. *A way of travel which quickly escapes the bounds of local regulative competence called for a more penetrating, uniform and exclusive regulation by the nation than had been thought appropriate for the more easily controlled commerce of the past.*" [Emphasis added.]

Mr. Pyle, Director of Aviation Development Council at La Guardia airport,

New York City, testified: "The approach to the solution of problems in air transportation at the local level just does not work. It has to be done on a national basis because it is a national operation." [R.Tr. 349.] He also stated that air transportation was to be differentiated from surface transportation because of the variance in the degree of flexibility between the two.

In viewing the effect of the BuOr with respect to preemption and the Commerce Clause issues, it appears that the Ordinance should be considered from the national level. The Supreme Court so held as to the railroads in Chicago v. Atchison, Topeka & Santa Fe Railroad Co., 357 U.S. 77, 86–87, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1957).

The case of American Airlines, Inc. v. Town of Hempstead, 272 F.Supp. 226 (D.C., E.D., N.Y., 1967), involved an Ordinance regulating noise levels which denied the lower air space to aircraft and closed the landing approaches and take-off paths of the Hempstead airport. The court said that the decisive question was whether the Ordinance " * * * conflicted with Federal law, or invades a field of legislation reserved to the National government."

In discussing the test of power to enact the Ordinance, the court states:

"Such an ordinance as Hempstead's cannot be considered in the accident of its particular circumstances. * * In the perspective of power, the ordinance must be tested as if it were one of a set of ordinances each enacted by a bordering town, and all, taken together, enveloping the airport. Diversion of the airport traffic over another Town would then be impossible and each ordinance would be revealed in its inner nature as a direct regulation of aircraft flight. * * * The question remains, may the municipalities that surround an airport adopt such ordinances as Hempstead's which deny to aircraft those parts of the navigable air space that cannot be used without causing noise on the ground in excess of specified limiting noise spectra.

" * * * legislation, whatever its purpose, that denies access to navigable air space by local rule cannot but be regarded as a plain and forbidden exertion of the power to regulate commerce as such. * * *

"But even if the commerce clause were not thought without more to preclude local action of the kind here involved, the actual exercise by the Congress of the power to regulate in this field is so pervasive as to preclude valid enactment of the Hempstead Ordinance. It would be difficult to visualize a more comprehensive scheme of combined regulation, subsidization and operational participation than that which the Congress has provided in the field of aviation." [Pages 231–232.]

After enumerating the Federal statutes, regulations and activities of Federal agencies in the field of air navigation and traffic, the Court observes:

"The federal regulation of air navigation and air traffic is so complete that it leaves no room for such local legislation as the Hempstead Ordinance". [Citing numerous cases.] Page 233.

At page 235 the Court says:

"Local initiative in noise control of aviation is inherently an effort to regulate a consequence while disclaiming regulation of the cause. It cannot coexist with a comprehensive system of federal regulation of aircraft manufacture (through certificates of airworthiness) and federal regulation of air navigation and air traffic."

## VIOLATION OF COMMERCE CLAUSE

■ Congress is vested with the authority to regulate commerce among the States by Article I, Section 8, Clause 3, of the Constitution. The rule is well established that state and local governments may not unreasonably burden commerce by their acts. The BuOr, while it does not seek to completely deny the use

of navigable air space, does seek to eliminate its use by jet aircraft for eight hours of the day.

Continental Airlines, an interstate carrier by virtue of Certificate of Public Convenience and Necessity issued by the CAB on May 12, 1970, Exhibit 9, now serves the Hollywood-Burbank area from the HBA. One of its scheduled routes is from Burbank to Seattle and return. The evidence shows that if Seattle imposed an ordinance similar to the BuOr no jet aircraft could leave Seattle, or any city in the Northwest, for HBA after 7:00 P.M., nor could a plane depart HBA for Seattle after 7:00 P.M. in order to arrive at the respective destinations before the nocturnal curfew hour of 11:00 P.M. Thus, with such an Ordinance in effect in only two airports the hours of take-off from both airports for flights to and from Seattle would be curtailed to only twelve hours of the day, not eight hours as in the case of the curfew in force at only one of the airports.

The Certificate of Public Convenience and Necessity now issued to scheduled airlines by the CAB authorizes them to fly a specific route or routes and also obligates the line to give *adequate service* to the cities on their routes. [R.Tr. 232.]

General Von Kann, Vice-President, Operations and Engineering, of Air Transport Association of America, testified that a curfew Ordinance, if valid, would be adopted by virtually all types of local airport authorities. [R.Tr. 322.] Mr. Pyle testified in similar vein. [R. Tr. 334.]

 The noise problem created by jet aircraft is well known and it appears to the Court that a curfew Ordinance, if valid, would promptly be adopted by virtually all cities surrounding airports. Considered singly, such an Ordinance might not impose an unlawful interference with interstate commerce in all cases. However, considered on a national level, the Ordinance could not stand. Based on authorities discussed hereinabove, the Court concludes, as noted above, that in determining the effect on commerce the Ordinance is to be considered on a national basis. Mr. Mitchell, Vice-President of Continental Airlines in charge of corporate planning, Mr. Pyle, and General Von Kann, testified in depth on the effect of such an Ordinance, on a national basis, on interstate commerce as well as on the efficient use of the air space. Some 1009 flights of scheduled airlines would have to be eliminated or re-scheduled. [Exhibit 52, R. Tr. 103–06.] Position problems as to planes would eliminate 1370-odd additional flight operations. [R.Tr. 336.]

Approximately 48% of air mail and 42% of air freight is moved at night. [Exhibit 55, R.Tr. 337–39.] It should be noted that no air mail is flown out of HBA.

If the experience of Continental is average, the Ordinance on a national basis would increase costs by 25% (R.Tr. 261–63) by reason of the loss in the utilization of aircraft as well as the required purchase of new planes to meet the concentration of flights within the permitted hours of take-off, if, in fact, the re-scheduling of flights so eliminated could be accomplished from a practical standpoint. Additional maintenance shops would also have to be established by all airlines to accomplish the required maintenance at necessary locations for proper and efficient use of their planes. [R.Tr. 302–305.]

It appears from the evidence that there would be a very serious loss of efficiency as to the use of air space if a national curfew were imposed. Obviously, if the use of the air space at HBA were curtailed by eight hours per day and this limitation of use time compounded by the adopting of such Ordinance effective as to other airports used by interstate and intrastate airlines, the carriage of interstate passengers and goods would be seriously interrupted and would conflict with the certificated rights and obligations of such airline. See Castle v. Hayes Freight Lines, 348 U.S. 61, 63–64, 75 S.Ct. 191, 99 L.Ed. 68 (1954), where the Court held the State of Illinois was

without authority to revoke or suspend operations in that state of an interstate motor carrier for violation of a law regulating the weight of loads to be carried on the state's highways. Southern Pacific Co. v. Arizona ex rel. Sullivan, 325 U.S. 761, 767 and 775, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945), where the Supreme Court held invalid an Arizona Ordinance regulating the length of trains, the Court observing that if one state may regulate train lengths so may all others, resulting in a serious impediment to the free flow of commerce.

■ There is no conflict in the evidence adduced in this case and it should be concluded that air commerce, by reason of its speed and volume, requires a single authority in control if it is to be conducted at maximum safety and efficient use of the navigable air space.

The evidence discloses that air traffic is unique and should be controlled on the national level.

The case of Stagg v. Municipal Court of Santa Monica, 2 Cal.App.3d 318, 82 Cal.Rptr. 578 (Dec., 1969), is relied on by the defendants in support of their contention that there is no preemption by the Federal Government of the field covered by the BuOr so as to make the Ordinance invalid and unenforceable.

The Santa Monica Airport (SMA), which was involved, was city owned and the California District Court of Appeals (DCA) held a curfew Ordinance adopted by the City of Santa Monica, which precluded jet aircraft from taking off from the SMA between the hours of 11:00 P.M. and 7:00 A.M. the next day, to be valid. The SMA is not used by scheduled or intrastate airlines. The Appellate Court reversed the Superior Court's ruling that " * * * the Ordinance was invalid because its subject matter was preempted by State law." The DCA held that the field was not so preempted and in the instant case the Attorney General also asserts non-preemption of the field by the State. At page 579 of its opinion, the DCA, in referring to the Superior Court, says:

"The court found it unnecessary to decide whether there was any federal preemption."

It observes two paragraphs later:

"Preliminarily, it must be recognized that the doctrine of federal preemption has no application here."

The opinion of the DCA, as to preemption, appears to turn on its conclusion that the curfew Ordinance was an unreasonable regulation which only incidentally affected the right of flight but did not impair that right. The Court, after stating its research disclosed no Federal or California enactment which directly conflicts with the Ordinance in question, states:

"The United States by virtue of its sovereignty over navigable airspace has the paramount power to regulate air traffic. Federal statutes, after defining navigable airspace * * *, authorize the administrator to regulate the use of navigable airspace and to establish rules governing the flight, navigation, protection and identification of aircraft." [Page 580.].

The Court did not ground its decision on the proprietary capacity of the city but did discuss the city's rights to regulate its municipally owned airport as a public utility and the authority of the city to regulate the use of the airport under Section 50470–50474, California Government Code. [Pages 580–581.]

Loma Portal Civic Club v. American Airlines, Inc., 61 Cal.2d 582, 39 Cal. Rptr. 708, 394 P.2d 548 (1964), a decision of the California Supreme Court in bank, is cited and discussed by the DCA in the Stagg case, supra. The members of the Loma Portal Civic Club resided in the flight path of jet aircraft using adjacent Lindbergh Field in San Diego. They sought to prohibit such flights at low altitudes and at such times as to interfere unreasonably with the use and enjoyment by plaintiffs of their homes.

The Court denied injunctive relief but did not find preemption on the part of the Federal Government as a grounds

for precluding the relief sought. In denying relief, the Court said:

"It is clear, therefore, that it would be contrary to the policy of this state to grant an injunction against flight operations in the vicinity of a public airport, conducted by regularly scheduled, certificated airlines, not alleged to be conducted in violation of federal orders and regulations or in an imminently dangerous manner, and not alleged to be carried on in a manner inconsistent with the public interest inhering in the continuation of such service.

\* \* \* \* \* \*

"We hold here that under the facts of this case, i. e., the operation of aircraft with federal airworthiness certificates in federally-certificated, scheduled passenger, service, in conformity with federal safety regulations, in a manner not creating imminent danger, and in furtherance of the public interest in safe, regular air transportation of goods and passengers, an injunction is not available." [Pages 713–714, 394 P.2d pages 553, 554.]

Reference is also made by the Court to the right of landowners who suffer from aircraft annoyances to seek damages from the owner or operator of the aircraft or the owner or operator of the airport involved. It also points out that it is not making a determination with respect to the rights of the parties where private airplanes and airports are concerned. [Pages 714, 715–716, 394 P.2d pages 554, 555, 556.]

The Court, in American Airlines, Inc. v. Town of Hempstead, 272 F.Supp. 226, supra, also discussed the right of landlords to just compensation if overflights are of such a nature as to amount to a taking of property for public purposes. [Page 231.]

Prior to the decision in the Stagg case, supra, the City Attorney of Burbank rendered an exhaustive opinion to the Burbank City Manager, dated September 22, 1969, wherein he concluded that the City of Burbank had no power to limit or restrict flights of aircraft utilizing HBA. Copy of the opinion appears as Exhibit A to the supplemental memorandum of points and authorities filed by plaintiffs Lockheed and PSA on May 22, 1970.

The City Attorney now explains that his conclusion was based on the theory that the State of California had preempted the area of restriction of flights and amount of noise emitted by jet aircraft. However, on page two of the opinion, the City Attorney says: "The City of Burbank has no power to establish restrictions on flights or the amount of noise which may be emitted by aircraft using the Hollywood-Burbank ariport for the reason that this area of control has been preempted by the State *and Federal governments.*"

The opinion discusses several of the cases cited by counsel on both sides in the case at bar as well as the activities of the Federal Government in the field involved.

In summarizing the opinion it is said, the residents in the vicinity of the HBA should limit their complaints to Lockheed Air Terminal and present their views as to noise to the FAA and the Department of Aeronautics of the State of California and that legislative action can only be accomplished by the Congress of the United States or the State Legislature.

The problems created by noise from jet aircraft are serious and disturbing, to say the least. Effective means has not as yet been found to reduce the noise to desired sound levels. In some airports the required use of certain runways in take-off will send the aircraft out over the ocean or other non-populated areas. However, in the landlocked, thickly populated area in which HBA is located, the use of preferential noise abatement runways is helpful to reduce the noise over Burbank but it merely diverts it to other populated areas. It will be noted from Exhibit A hereto that planes taking off on runway 25 are not over Burbank at any time, and the evidence shows that those taking off on runway 15, with des-

tination to the North, turn West after take-off and are in the Burbank air space but for a very short time.

Our scientific and mechanical expertise has not yet solved the problem of noise resulting from the generation of power by jet engines. However, if the time during which the navigable air space may be used is to be curtailed, the Court concludes that the action must come from Congress, or its authorized agency, if the safe and efficient use of the air space is to be maintained and interstate commerce protected from unreasonable burden and interference.

The plaintiffs are entitled to injunctive relief, as prayed, and for their costs of suit herein.

Plaintiffs' counsel are requested to prepare, serve and lodge proposed Findings of Fact, Conclusions of Law and Judgment in accordance with the provisions of Local Rule 7.

This Memorandum is not to be deemed a final judgment.