489 P.2d 854

Governor Jack A. WILLIAMS, Commander-
in-Chief, National Guard of Ari-
zona, Petitioner,

v.

The SUPERIOR COURT of the State of Ari-
zona, IN AND FOR the COUNTY OF
PIMA, and Sunnyside School District No.
12, real party in interest, Respondents.

No. 2 CA–CIV 1031.

Court of Appeals of Arizona,
Division 2.

Oct. 19, 1971.

Rehearing Denied Nov. 9, 1971.

Review Granted Dec. 7, 1971.

Gary K. Nelson, Atty. Gen., by John S.
O'Dowd, Asst. Atty. Gen., and David I.
Kali, Associate Counsel, Tucson, for peti-
tioner.

Rose Silver, Pima County Atty., by
Lawrence Ollason, Special Deputy County
Atty., Tucson, for respondents.

HOWARD, Judge.

The respondent, Sunnyside School Dis-
trict No. 12, filed a complaint in the Supe-
rior Court of Pima County alleging that
the Air National Guard of Arizona was
flying its aircraft over Sunnyside School
at such a height and with such noise as to
create a hazard to the students and an in-
terruption of the normal use and reason-
able enjoyment of the school facilities. In
its prayer for relief in the lower court the
respondent asked the court to permanently
enjoin the Arizona Air National Guard
from taking off or landing within the air-
space immediately above or in proximity to
the school buildings with the exception of
emergency situations.

Respondent has also filed in the Superi-
or Court of Pima County another action in
inverse eminent domain against the Tucson

Airport Authority based upon the same facts.[1]

A hearing was held in the trial court to determine whether or not a temporary injunction would issue. At the hearing petitioner made a motion to dismiss. Based upon the memoranda previously filed by the parties and upon the testimony taken on the issue of the temporary injunction, the court denied the temporary injunction, denied petitioner's motion to dismiss plaintiff's complaint and set the case for trial. Petitioner asks this court to prohibit the Superior Court of Pima County from proceeding further in the action and for a further order directing the Superior Court to grant the petitioner's motion to dismiss the complaint. The appropriateness of the relief sought here by special action is firmly established. Isaacs v. Superior Court, 15 Ariz.App. 232, 487 P.2d 1044 (1971).

The facts show that the Arizona Air National Guard is a subtenant on the airport premises which are leased by Tucson Airport Authority and owned by the City of Tucson. The airport, known as Tucson International Airport, is used by private aircraft, commercial carriers and military aircraft. The Arizona Air National Guard is conducting a training school at Tucson International Airport the mission of which is to upgrade pilot training by teaching pilots of the Arizona Air National Guard and the Air National Guard of other states to fly F–100C and F–100F jet aircraft. This program has greatly increased the number of flights which land and take off from the airport. Air National Guard pilots from other states are sent to the school at Tucson International Airport by authority of the Secretary of the Air Force. Normally the Arizona Air National Guard at Tucson International Airport flies its aircraft only on weekends when the children are not attending school. However, when the training school is being conducted, flights occur during the week and during school hours. At oral argument on this petition, the attorney for the respondent school district stated that the school district did not object to the flights during the weekends but did object to the training of out-of-state pilots and use of the facilities during school hours.

The testimony at the hearing on the temporary injunction reveals that all flights at Tucson International Airport are controlled by employees of the Federal Aviation Administration housed in the tower at the airport. There is one main long runway at the airport which has a different name depending on which direction one is traveling. If an aircraft is taking off or landing in a northwesterly direction, or a heading of approximately 300°, the runway is known as thirty right (30R). Conversely, if one is using the same runway but taking off or landing in a southeasterly direction, or a heading of approximately 120°, the runway is known as twelve left (12L). Sunnyside School is in a northwesterly direction from the airport and respondent seeks to prevent the Air National Guard from taking off on 30R or landing on 12L. A Federal Aviation Administration employee, who is a controller in the tower, testified that the choice of runways depended on traffic and on wind conditions. Nowhere in the pleadings or in the testimony was there any allegation or evidence that the Air National Guard was violating any regulation promulgated by the Federal Aviation Administration in the operation of its aircraft at Tucson International Airport.

Although petitioner has advanced several grounds to us in support of his position, we need only discuss one, and that is the doctrine of preemption.

The Federal Aviation Act of 1958 provides, *inter alia*:

"There is recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit through the navigable airspace

[1]. Sunnyside School District No. 12 v. Tucson Airport Authority, cause No. 123288 (filed December 3, 1970)..

of the United States." 49 U.S.C.A. § 1304.

House Report 2360, 85th Congress, 2nd Session, on the Federal Aviation Act of 1958, states as to its general purpose:

"The principal purpose of this legislation is to establish a new Federal agency with powers adequate to enable it to provide for the safe and efficient use of the navigable airspace by both civil and military operations." (U.S.Code Cong. & Admin.News 1958, p. 3741).

49 U.S.C.A. § 1301(24) defines navigable airspace as follows:

" 'Navigable airspace' means airspace above the minimum altitudes of flight prescribed by regulations issued under this chapter, and shall include airspace needed to insure safety in take-off and landing of aircraft."

Pursuant to the Federal Aviation Act of 1958, 49 U.S.C. §§ 1301–1542, as amended, the Federal Aviation Administration has promulgated a comprehensive body of regulations which can be found in Title 14, Code of Federal Regulations. 14 C.F.R. §§ 91.61–91.129 sets forth flight rules governing the operation of aircraft within the United States. 14 C.F.R. § 91.87(f) (1) provides that each pilot shall comply with any departure procedures established for that airport by the Federal Aviation Administration.[2] The Administration has issued a manual dated April 1, 1971, and numbered 7110.8B, entitled "Terminal Air Traffic Control" which sets forth the rules governing air traffic at all airports having a control tower and in addition the Administration has promulgated as an appendix to the manual a document regulating air traffic at Tucson International Airport entitled "Tucson International Airport Aircraft Traffic Patterns."

Congress has also given the FAA the authority to prescribe regulations controlling aircraft noise, Pub.Law 90–411, § 1, 82 Stat. 395, 49 U.S.C. § 1431 (Supp. V, 1968).

In Lockheed Air Terminal, Inc. v. City of Burbank, 318 F.Supp. 914 (D.C.1970), the court, in holding that the management of airspace has been preempted by Congress, noted that the Federal Aviation Act established the Federal Aviation Agency, now the Federal Aviation Administration, in replacement of the then Civil Aeronautics Board. The FAA was vested with "plenary authority" to allocate airspace and control its use by both civil and military aircraft. Senate Report 1811 on the 1958 Act, after observing that the action of the CAB in its control over airspace allocation and air traffic rules rested for the most part upon the shifting sands of legal ambiguity, says:

"The present legislation proposes to clear away this ambiguity once and for all by vesting unquestionable authority for all aspects of airspace management in the Administrator of the new Agency. * * * The splintering of airspace management in the past through committee and panel negotiation has already been discussed. It is one of the evils which this bill is designed to eliminate. As indicated above, it is for this reason that the bill proposes to vest in a single Administrator plenary authority for airspace management. If such authority is once again fractionalized and made subject to committee or panel decision, the evil will only be continued. * * * The number of planes seeking their share of our airspace has almost quadrupled since 1938. Furthermore, the larger and faster that aircraft have become, the more airspace is required for each if proper separation is to be maintained."

Whether or not there has been an express intent by Congress to preempt the field is the issue that must be initially determined. This issue was fully considered

---

2. It has been repeatedly held that regulations such as these have the force of law. *See e. g.* Public Utilities Commission of State of Cal. v. United States, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958) ; Electric Construction Co. v. Flickinger, 107 Ariz. 222, 485 P.2d 547 (1971).

by the Supreme Court in Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), wherein the Court stated:

"So we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. [citations omitted] Such a purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. [citations omitted] Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. [citation omitted] Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. [citations omitted] Or the state policy may produce a result inconsistent with the objective of the federal statute. [citation omitted] It is often a perplexing question whether Congress has precluded state action or by the choice of selective regulatory measures has left the police power of the States undisturbed except as the state and federal regulations collide. [citations omitted]" 331 U.S. at 230–231, 67 S.Ct. at 1152.

From the broad scope of federal statutes and regulations governing and controlling the use of airspace and air traffic, we conclude that Congress intended to centralize full and dominant control of the navigable airspace in the federal government so as to provide for its safe and most efficient use. Lockheed Air Terminal, Inc. v. City of Burbank, supra; American Airlines, Inc. v. Town of Hempstead, 398 F.2d 369 (2d Cir. 1968), cert. denied 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969).

Analogizing the power of the federal government to control navigable streams and waters, respondent relies on Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), as authority for the proposition that exclusive federal control of navigable airspace does not preclude state action. We consider the case cited by respondent as being singularly inapposite. In that case, the Detroit ordinance which was upheld by the Supreme Court of the United States involved smoke abatement and had been violated by one of the ships of appellant company duly licensed to operate in interstate commerce under a regulation enacted by Congress. The court concluded that the mere possession of a federal license did not immunize the ship from the operation of the normal incidence of police power not constituting a direct regulation of commerce. Furthermore, the ordinance did not exclude a licensed vessel from the Port of Detroit nor did it destroy the right to free passage.

The result of the relief asked for by the respondent in this action would, however, contrary to the ordinance in the *Huron Portland Cement Co.* case, constitute a direct regulation of the flight of aircraft through navigable airspace.

This court has, of course, great concern for the welfare and safety of the children in this community. However, this concern does not permit us to wade in forbidden waters. Indeed, if the record did in fact disclose violations of the FAA regulations, the proper forum would not be a court of this state but rather, the United States District Court.

■ We wish to make it clear that our determination as to the right to injunctive relief in this case is not determinative of the inverse eminent domain issue pending in the other case filed against the Tucson Airport Authority. Although one may not enjoin the flights of aircraft using navigable airspace pursuant to the authority and control of the FAA, this does not mean that the privilege to use navigable airspace automatically means freedom from liability for demonstrable pecuniary loss to property owners below. Martin v. Port of Seattle, 64 Wash.2d 309, 391 P.2d 540 (1964),

**484**

cert. denied 379 U.S. 989, 85 S.Ct. 701, 13 L.Ed.2d 610 (1965).

 Since the trial court considered evidence outside the pleadings in its determination as to this matter, the motion below was really treated as a motion for summary judgment. Rule 12(b), Rules of Civil Procedure, 16 A.R.S.

Accordingly, the trial court is ordered to enter summary judgment in favor of the petitioner and against respondent.

KRUCKER, C. J., and JACK G. MARKS, Superior Court Judge, concur.

NOTE: Judge JAMES D. HATHAWAY having requested that he be relieved from consideration of this matter, Judge JACK G. MARKS was called to sit in his stead and participate in the determination of this decision.